606 So.2d 845 (1992)
STATE of Louisiana, Plaintiff-Appellee,
v.
Rachel D. ROSE, Defendant-Appellant.
No. 24040-KA.
Court of Appeal of Louisiana, Second Circuit.
September 23, 1992.
*846 Jack H. Kaplan, for defendant-appellant.
Richard Ieyoub, Atty. Gen., Paul J. Carmouche, Dist. Atty., W. Stanley Lockard, Asst. Dist. Atty., for plaintiff-appellee.
Before NORRIS, LINDSAY and STEWART, JJ.
NORRIS, Judge.
Rachael D. Rose appeals her conviction, by unanimous jury verdict, for second degree murder and the mandatory life sentence imposed. La.R.S. 14:30.1. We find no merit in her eight assignments of error and thus affirm the conviction and sentence.

FACTS
On the evening of October 27, 1990, Rachael Rose ran into Tom Demery, a longtime *847 acquaintance, in the parking lot of a grocery store in Shreveport. According to Ms. Rose, Demery asked her for money; when she refused, he struck her on the chin. She then left and went to The Ebony Club, where she got drunk on beer and whiskey. By about 11:00 p.m. she left the club and went to an area by the Municipal Auditorium for "business." Ms. Rose is a prostitute. That night, she had sex with five customers at $20 apiece; after each job, she bought and shot up cocaine.
Sometime around 6:00 a.m. the next morning (Sunday, October 28), Ms. Rose went home but found herself too high to sleep. Around 7:00 a.m. she returned to The Ebony Club, intending to get a bottle of wine from a "bootlegger." She again ran into Demery standing outside the club. He apologized for hitting her the night before and offered to chip in on her wine purchase. She invited him to accompany her to the house of Ellison Washington, an elderly friend of hers and potential fiancé. On the way there they ran into Washington, who told them to go on to the house and he would meet them there after he got his breakfast. Ms. Rose and Demery bought a fifth of Thunderbird and proceeded to Washington's house.
Once there Ms. Rose and Demery drank wine and played cards. A few minutes later Washington's next-door neighbor, Pauline Copeland, came over. She often stopped by to look in on Washington, who was suffering with lung cancer. Washington came back from breakfast but did not join the card game; only Ms. Rose and Demery were playing. According to Ms. Copeland, Demery got "staggering drunk" while Ms. Rose was still "coherent." Ms. Rose, however, testified she was drunk and still high from all the cocaine. She won 75¢ from Demery, which angered him. The incident really began, however, when Demery made a rude comment about Ms. Copeland's appearance.
According to Ms. Copeland, Demery and Ms. Rose talked back and forth to each other but Demery was too drunk to challenge her. Nevertheless Ms. Rose reached over the table, grabbed him by the collar and lifted him up. Ms. Copeland spotted a butcher knife stuck in the back of Ms. Rose's pants; she came up behind, pulled it out and laid it on the table. Ms. Rose pushed Demery toward the door and shoved him out, first reaching for the butcher knife. She continued to shove him off the porch and into the front yard. Demery was very drunk and offered no resistance; he had never even threatened Ms. Rose. In the front yard Ms. Rose grabbed his collar again and cut him in the face with the knife. He begged her, "Don't hit me any more." Ms. Rose promptly stabbed him twice in the chest, and Ms. Copeland and Ellison Washington came to wrest the knife from her. Demery stumbled off toward Doctor's Hospital while Ms. Rose went back inside, changed her clothes and left the scene.
Ms. Rose testified that she asked him to leave after he insulted Ms. Copeland. He did not leave, and grew abusive, cursing at her, pushing and striking her in the chest. Ms. Rose testified they were actually fighting inside the house, which Ms. Copeland denied. According to Ms. Rose, Demery went to the door but kept "clowning" with her in an unfriendly way. He left, but for some reason she could not explain, Ms. Rose followed him outside and the fight resumed. Ms. Rose testified that even though he was leaving, he threatened that he would "be back," so she pulled the butcher knife out of her pants and cut him in the face. Ms. Rose claimed not to remember stabbing him in the chest, though she admitted that Washington and Ms. Copeland finally got the knife away from her.
According to Ms. Copeland, Demery staggered away and made it about a half block before he fell over to the sidewalk. At 9:57 a.m., the police were notified; they discovered Demery on the sidewalk and took him to the hospital.
Witnesses at the scene told police that Ms. Rose was involved in the stabbing. She was picked up and gave officers a fictitious name, Marry Williams; however, Ms. Copeland identified her as Rachael Rose. She was charged with attempted *848 second degree murder. Shortly thereafter, at the police station, the charge was upgraded when police learned that Demery had died at the hospital.
The grand jury returned an indictment for second degree murder on December 14, 1990. After jury trial in November 1991, Ms. Rose was found guilty as charged and sentenced to life imprisonment. This appeal followed.

DISCUSSION

I. Motion to suppress defendant's statement
In her first assignment, Ms. Rose urges that the trial court erred in failing to suppress the statement she made to Detective Don Ashley some two hours after her arrest on the day of the murder. She claims that the alcohol and cocaine she had consumed rendered her incapable of giving a free and voluntary statement.
Before a confession may be introduced into evidence, the state has the burden of affirmatively proving that it is the product of a free and voluntary choice. La.C.Cr.P. art. 703 D; La.R.S. 15:451; State v. Simmons, 443 So.2d 512 (La.1983); State v. King, 573 So.2d 604 (La.App. 2d Cir.1991). Where an accused makes a confession during custodial interrogation, the state must also establish that the police advised him of his Miranda rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Simmons, supra; King, supra.
Where the free and voluntary nature of a confession is challenged on the ground of a defendant's intoxication at the time of the interrogation, the confession will be rendered inadmissible only when the intoxication is of such a degree as to negate the defendant's comprehension and to render him unaware of the consequences of what he is saying. Whether intoxication exists and is of a degree sufficient to vitiate the voluntariness of the confession are questions of fact. The admissibility of a confession is in the first instance a question for the trial judge. His conclusions on the credibility and weight of the testimony relating to the voluntariness of the confession will not be overturned unless they are not supported by the evidence. Simmons, supra, and citations therein; King, supra.
Only Detective Ashley testified at the suppression hearing. He stated that Ms. Rose gave an unrecorded interview at 12:31 p.m. on the day of the murder, stating that she knew the victim, had seen him the night before, and had run into him again that morning and invited him to go with her to Washington's house. The two played cards and drank together until she won some money from him; he became verbally abusive. They then went outside Washington's home, where Demery became very upset. Ms. Rose told Detective Ashley that she always carries a knife with her because she has been raped; when she felt threatened by Demery, she slashed him in the face with her knife. She denied stabbing him in the chest.
Detective Ashley testified that during the interview Ms. Rose's demeanor was one of awareness; she was oriented and responsive to his inquiries. She told him in considerable detail about the events leading up to the stabbing. She also told him she understood the charge for which she was arrested and knew why she was in jail. Det. Ashley noted that Ms. Rose signed the Miranda rights card in a clear, steady hand (a fact borne out by the card in evidence), and that she told him she understood her rights as he reviewed them with her one by one.
In his 20 years' experience as a police officer, Det. Ashley had interviewed many suspects who had been drinking or using drugs. He testified that, while he could smell alcohol on Ms. Rose's breath and observed track marks on her arms, he believed her responses to his questions and her general demeanor indicated an ability to comprehend the situation and to knowingly and intelligently waive the right to remain silent.
Based on Det. Ashley's unrebutted testimony, we cannot say that Ms. Rose's intoxication was sufficient to negate her comprehension and render her unaware of the consequences of her statement. The trial court's ruling on the motion to suppress *849 was adequately supported by the evidence. This assignment is without merit.

II. Ineffective assistance of counsel
In her second assignment, Ms. Rose urges that she had ineffective assistance of counsel from October 29, 1990, when an indigent defender was appointed to the case, until July 24, 1991, when retained counsel enrolled.
Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) establishes a two-prong test to determine ineffective assistance of counsel. First, the defendant must show counsel's performance was so deficient that it failed to provide the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show he was prejudiced by counsel errors so serious as to deprive him of a fair trial with a reliable result. One claiming ineffective assistance of counsel must identify specific acts or omissions; general statements and conclusory charges will not suffice. See also State v. O'Neal, 501 So.2d 920 (La.App. 2d Cir.), writ denied 505 So.2d 1139 (La.1987).
The court minutes show that Ms. Rose's appointed counsel requested a preliminary examination on October 29, 1990, one day after the arrest. The preliminary examination was held November 22, 1990, at which time the court found probable cause. Two weeks later, on December 5, appointed counsel filed a motion for discovery; the state's response was filed February 5, 1991. In the interim, the grand jury returned an indictment on December 14, 1990. Counsel was present when Ms. Rose was arraigned on January 22, 1991, when she pled not guilty and not guilty by reason of insanity. Shortly thereafter, on February 8, counsel moved for appointment of a sanity commission, which the court granted by appointing Drs. E.H. Leatherman and James Phillips to examine Ms. Rose. The sanity hearing, originally scheduled for March 11, was held on April 15; the court found Ms. Rose competent to stand trial and assist counsel in her defense. An evidentiary hearing was set for May 28, rescheduled for July 9 and then set again for August 5. Trial was set for August 12. On July 24, retained counsel enrolled as counsel of record.
This summary establishes that appointed counsel did not let the case languish on the back burner, but remained actively involved in Ms. Rose's defense until the enrollment by retained counsel. The record also belies Ms. Rose's contention that it was lack of communication with appointed counsel that forced her to file a pro se discovery motion on July 17. Counsel had requested and received appropriate discovery months before Ms. Rose's motion was filed; she had contact with counsel on several occasions in the interim. The record reveals no neglect of Ms. Rose's case.
Ms. Rose further argues that appointed counsel's failure to file a motion to suppress her statement to Det. Ashley rendered her counsel ineffective. Under the circumstances of the case, however, this is not a deficiency in appointed counsel's performance. Retained counsel filed a timely motion; Ms. Rose has not shown she was prejudiced by the situation. This assignment is without merit.

III. Jury composition

A. Challenges for cause
In assignment three, Ms. Rose contends that the trial court erred in overruling several defense challenges for cause; she suggests that the trial court's action deprived her of the right to an impartial jury because she was forced to exercise peremptory challenges and was ultimately forced to accept "one or more obnoxious jurors" antagonistic to her plight. This assignment is not briefed and is therefore considered abandoned. U.R.C.A.Rule 2-12.4; State v. Dewey, 408 So.2d 1255 (La.1982); State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir. 1989), writ denied 558 So.2d 1123 (La.1990).

B. Improper procedures & discrimination
In her fourth assignment of error, Ms. Rose contends that the state used its peremptory challenges to prejudicially and systematically exclude five black women *850 from service on the jury, specifically venirepersons Hancock, Washington, Moore, Collins and Gipson. Ms. Rose also contends that the ultimate composition of the jury does not reflect the current demographic profile of Caddo Parish.
Batson objections. The primary portion of the assignment poses a claim based on Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The holding of that case is codified in La.C.Cr.P. art. 795 C, which provides that a peremptory challenge by the state shall not be based solely on the race of a prospective juror.[1]
A defendant making a Batson objection is required to establish a prima facie case of purposeful discrimination. In doing so, he must show that pertinent circumstances raise an inference that the prosecutor used peremptory challenges to exclude venire members of a cognizable racial group from the jury solely on the basis of race. Batson, supra; State v. Collier, 553 So.2d 815 (La.1989). The criminal defendant may object to race-based exclusions, however, irrespective of whether he and the excluded juror share the same race. Powers v. Ohio, 499 U.S.___, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).
On a showing of prima facie discrimination, the burden shifts to the state to come forward with a neutral explanation for challenging jurors. While that explanation need not rise to the level of a challenge for cause, a prosecutor does not meet that onus by merely stating his assumption or intuitive judgment that the excused jurors would be partial to the defendant because of their shared racial identity. The explanation must be clear, racially-neutral, reasonably specific and related to the case at bar. Collier, supra.
Where the trial judge does not find that the defense has made a prima facie case, there is no need to call for the prosecutor's explanation. Nonetheless, many trial judges prefer to do so in order to create a complete record. See Collier, supra, 553 So.2d at 819 n. 5.
The instant jury was ultimately composed of six white females, four white males, two black females and one white alternate. R. p. 599. The defense did not make contemporaneous objections with the exercise of each challenge by the prosecution, but waited until venirepersons Washington and Moore were challenged on the second day of voir dire. R. p. 408-9. By that time, the prosecution had exercised five peremptory challenges, all against black females.
In response to defense counsel's complaint, the prosecutor explained that he challenged Ms. Hancock because she stated she did not want to serve and asked to be excused; he remembered nothing else about her. R. pp. 418, 422. A perceived lack of interest or unresponsiveness is an acceptable, racially neutral reason for exercising a peremptory challenge. State v. Johnson, 561 So.2d 922 (La.App. 2d Cir. 1990), and citations therein; State v. Tucker, 591 So.2d 1208 (La.App. 2d Cir.1991), writ denied 594 So.2d 1317 (La.1992), and citations therein.
The prosecutor stated he challenged Ms. Washington because she did not appear to understand the legal insanity defense. Her work involved contact with insane people and she appeared overly sympathetic. The prosecutor felt she would not be impartial. R. pp. 418-19. These are racially neutral reasons for a challenge. See State v. Lindsey, 543 So.2d 886 (La. 1989), cert. denied 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990), dealing with the inability of a prospective juror to grasp the legal issues in a case and State v. McDowell, 582 So.2d 364 (La.App. 2d Cir.), writ denied 586 So.2d 567 (La.1991), discussing partiality of a prospective juror sympathetic to the defendant.
A challenge of Ms. Moore issued because her husband had a previous DWI conviction, she admitted two misdemeanors, *851 and her brother had been convicted of a drug offense. R. p. 419. It is well-settled that former convictions or present charges against a prospective juror or members of that juror's family are racially-neutral reasons for exercise of a peremptory challenge. See Lindsey, supra; Johnson, supra; State v. Powell, 598 So.2d 454 (La.App. 2d Cir.), writ denied 605 So.2d 1089 (La.1992).
The prosecutor struck Ms. Collins because the schoolteacher expressed great concern over upcoming meetings with her pupils' parents and seemed upset over the time involved. R. p. 421. A perceived lack of concentration is a racially-neutral reason for exercise of a peremptory challenge. See Tucker, supra.
Finally, the prosecutor explained that he struck Ms. Gipson because of his past experience with her. He believed this prospective juror to be the lone holdout for a not guilty verdict in a previous trial he prosecuted. He felt that she would uncritically accept any alibi suggested by the defendant at trial. This explanation impugns the ability of the prospective juror to function as an independent trier of fact and decision-maker, an explanation which is clear, neutral, reasonably specific and related to the case at bar. See Collier, supra; Tucker, supra.
The record does not clearly show whether the court found that the defense had set forth a prima facie case of purposeful discrimination (R. p. 411); nevertheless, in keeping with the now widespread practice, the court called for the prosecutor's explanation and found those explanations to be valid and neutral. R. 422. The trial court's determination merits great deference. Batson, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21; Johnson, supra. Moreover, the ruling is supported by the record and the explanations the prosecutor offered adequately reflect racially neutral reasons for the peremptory challenges in question. There is no merit in this portion of the assignment.
C. Jury venire. Ms. Rose's secondary assertion concerns the makeup of the jury. Because the jury consisted of a total of ten whites and two blacks while the general population of the parish is two-thirds white and one-third black, she contends that a random selection of venirepersons should produce a jury consisting of at least four blacks. Anything short of that total indicates purposeful discrimination, a result Ms. Rose would have this court condemn as improper under an extension of Batson.
First, Ms. Rose implicitly attacks the manner in which the venire is drawn. However, it is well settled that a motion to quash the venire will not be granted unless there is fraud in the selection, some great wrong has been practiced which will work an irreparable harm on the defendant or there is a systematic exclusion of otherwise qualified persons solely on the basis of race. La.C.Cr.P. art. 419 A; State v. Lee, 559 So.2d 1310 (La.1990), cert. denied___ U.S.___, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991). Ms. Rose's argument is aimed at the last of these three reasons. She bears the heavy burden of establishing grounds for quashing the venire. Lee, supra.
In support of its position, the defense presented evidence regarding the statistical composition of the pool of voters and the selection methods used to impanel the venire. Gwendolyn H. Rogers, Chief Deputy Registrar of Voters for Caddo Parish, testified that as of the date she testified, November 16, 1991, there were 122,831 registered voters in the parish, of which 82,432 were white, 39,679 were black and 720 were classified as other. By sex, these voters are broken down as 53,420 males and 69,411 females. R. pp. 539-40.
Curtis Warren, the Clerk of Court and a member of the jury commission, testified in detail about the venire selection procedure. R. pp. 541-45. The commission uses a computer containing the names of all registered voters in Caddo Parish. This information is obtained in magnetic tape form from the Commissioner of Elections in Baton Rouge. The computer is programmed to draw ten thousand names at random. This list is the general venire.
Next, every other Thursday, the court orders that a new venire panel be summoned. *852 The commissioners meet and cast a die which contains numbers from one through one hundred. Once the number is fixed, the computer is instructed to draw one hundred names of registered voters in serial fashion to correspond with the number fixed. For example, if the number fixed by the die is 20, the computer draws at random every twentieth name until a total of one hundred names has been selected. Those one hundred people make up the new jury venire. The computer then prints the necessary paperwork to summon the venire at the appropriate time. Mr. Warren testified that the computerized information does not contain identifying race or sex information.
The use of voter registration rolls from which to draw jury venires has long been approved by the courts. State v. Sheppard, 350 So.2d 615 (La.1977). The use of a computer to randomly select a venire has also been approved. Sheppard, supra; State v. Melancon, 563 So.2d 913 (La.App. 3rd Cir.1990), writ denied 586 So.2d 527 (La.1991). As the random, non-discriminatory nature of venire selection was amply established by the evidence, Ms. Rose has failed to show that the venire should be quashed because "persons were systematically excluded from the venires solely upon the basis of race." C.Cr.P. art. 419 A.
Moreover, a defendant is not guaranteed a jury of a particular statistical composition. Batson, supra; State v. Stephenson, 291 So.2d 767 (La.1974); Melancon, supra, and citations therein. All that is required is that the manner in which that jury is selected is fair. The choosing of this jury, from venire selection to impanelling, occurred under procedures challenged and approved by the courts of this state as fair and impartial. Ms. Rose did not make a prima facie showing that persons were systematically excluded from the venire on the basis of race. The trial judge properly denied the motion to quash the jury venire. This portion of the assignment has no merit.
D. Partial jury venire. A further argument, detailed in assignment five, urges that the court erred in overruling her motion for additional jurors, necessitated by the exhaustion of the original panel. She asserts that instead of getting additional jurors, the court brought in those jurors who had been "rejected" from service in another courtroom. Because of this action, Ms. Rose complains that she had use of only about one-tenth of the original venire in this second round, rather than the full venire.
However, the sharing of the venire panel between two courtrooms has been approved in State v. Bradford, 298 So.2d 781 (La.1974), appeal dismissed 420 U.S. 915, 95 S.Ct. 1109, 43 L.Ed.2d 387 (1975). The state's argument correctly notes that just because prospective jurors have not been chosen to serve on a particular jury they are not "rejects," or incapable of serving on any jury. There are many reasons a person might be unable to serve on one jury, but perfectly capable of serving on another. For example, a family or close personal relationship with the judge, prosecutor, witness or party might disqualify a person in one case but not another. The evidence falls far short of establishing any violation of C.Cr.P. art 419 A, supra. We thus find no merit in this assignment.
IV. Responsive verdict instruction
By her sixth assignment, Ms. Rose claims that the court improperly instructed the jury about the responsive verdicts. The court included in its instruction "Not guilty by reason of insanity" as a responsive verdict, which Ms. Rose claims is a violation of C.Cr.P. art. 814. She urges that this mandates a new trial, because the jury may have been confused by this additional verdict option.
Defense counsel specifically requested that R.S. 14:14, which defines the insanity defense, be included in the jury charge. R. p. 89. It is difficult to see how the court's compliance with the defendant's request can now be urged as error. Moreover, Ms. Rose pled "Not guilty" and "Not guilty by reason of insanity" at her arraignment on January 22, 1991. C.Cr.P. art. 816 clearly states that when a defendant has properly *853 entered an insanity plea, "not guilty by reason of insanity" is an additional responsive verdict to those listed in art. 814. The court's verdict form complied with the article and is not error.
Ms. Rose also contends that the court failed to instruct the jury that insanity is "a complete defense." The argument completely ignores the transcript; the court defined insanity for the jury and instructed that where the defense is applicable "the offender shall be exempt from criminal responsibility." R. pp. 976-77.
This assignment is without merit.

V. Sufficiency of the evidence
Ms. Rose's seventh assignment urges that there is insufficient evidence to support her conviction because the state introduced little or no evidence to show that she intended to kill the victim.
La.R.S. 14:30.1 A(1) provides that second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982), and citations therein; State v. Doby, 540 So.2d 1008 (La.App. 2d Cir.), writ denied 544 So.2d 398 (1989). The determination of whether the requisite intent is present in a criminal case is for the trier of fact. Doby, supra.
In reviewing the correctness of such determination, the court should review the evidence in a light most favorable to the prosecution and must determine if the evidence is sufficient to convince a reasonable trier of fact of the guilt of the defendant beyond a reasonable doubt as to every element of the offense. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Doby, supra.
Credibility decisions are the jury's province. State v. Trosclair, 443 So.2d 1098 (La.1983), cert. dism. 468 U.S. 1205, 104 S.Ct. 3593, 82 L.Ed.2d 889 (1984); State v. Holland, 544 So.2d 461 (La.App. 2d Cir. 1989), writ denied 567 So.2d 93 (La.1992). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient for a requisite factual finding. State v. Emerick, 499 So.2d 195 (La.App. 2d Cir.1986).
The only evidence weighing against a finding of the requisite specific intent was Ms. Rose's own testimony that she did not remember inflicting the mortal blow, and that she stabbed the victim in the face while defending herself from his attack. She did not claim to be insane or too drunk to remember what she was doing.
We find that the evidence presented at trial is sufficient to prove Ms. Rose had the specific intent to kill or at least inflict great bodily harm on Demery. Pauline Copeland testified that she took the knife from Ms. Rose and placed it on the table while the defendant and Demery were arguing. Ms. Rose told Demery to leave, then reached across the table, grabbed him and began pushing him out the door. As she moved toward the door, she armed herself by picking up the knife. Ms. Copeland stated that Demery was too drunk to "help himself" (R. p. 670), and that he staggered as Ms. Rose pushed him down the front steps. Once outside, she slashed at the unarmed victim, inflicting the fatal wound after he begged, "Don't hit me anymore." R. p. 669.
Moreover, the coroner, Dr. McCormick, testified that the dullness of the knife made it likely Ms. Rose purposefully inflicted the fatal wound because of the force necessary to produce the type of injury which killed the victim. R. p. 746. Overall, it was certainly rational for the jury to accept Ms. Copeland's version of events, which is supported by Dr. McCormick's testimony, and to reject Ms. Rose's, which was self-serving and riddled with selective amnesia. State v. Holland, supra.
Ms. Copeland's testimony also contradicts Ms. Rose's contention that she acted in self-defense. Nothing in the record, including Ms. Rose's own testimony, would support a finding that the circumstances justified mortal force against this helplessly *854 drunk victim. When viewed in the light most favorable to the prosecution, the evidence negated Ms. Rose's claim of self-defense beyond a reasonable doubt, as well as her insanity and intoxication defenses, which were abandoned on appeal. The evidence is sufficient to support the conviction for second degree murder. There is no merit to this assignment.

VI. Failure to enter sentencing reasons in the record
Finally, Ms. Rose complains that the trial court erred when it failed to articulate the reasons for the mandatory life sentence imposed. At the sentencing hearing, defense counsel requested that the judge enter into the record the reasons for the sentence imposed, but the judge declined to do so.
The penalty for second degree murder is a mandatory sentence of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. R.S. 14:30.1 B. The trial court exercises none of the wide sentencing discretion available in other cases. Instead, the Legislature has prescribed the penalty for this crime. It would be a useless act for the judge to articulate reasons for imposing sentence when he has no choice but to impose a statutorily-mandated maximum penalty. He does not abuse his discretion by declining to do so. See State v. Williams, 445 So.2d 1264 (La.App. 3rd Cir.), writ denied 449 So.2d 1346 (La.1984). This assignment is without merit.

CONCLUSION
None of Ms. Rose's eight assignments of error have merit. We have examined the record for errors patent and find none. C.Cr.P. art. 920(2). Accordingly, Rachael Rose's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The Supreme Court has recently held that a criminal defendant is likewise prohibited from making race-based peremptory challenges. See Georgia v. McCollum, ___ U.S. ___, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).