MOORE, J.
11Antonio Jackson appeals his conviction of aggravated burglary and his sentence, as a fourth felony offender, of life in prison without benefits. We affirm.

Factual Background

Early on the morning of June 7, 2009, MJ was in her apartment on Harvey Place, a housing project in Jonesboro, Louisiana. MJ was 61 years old and confined to a wheelchair, having lost one leg and suffering from diabetic neuropathy in the other. Unable to sleep, she was talking to a friend on the landline phone. She testified that around 3 a.m., she heard a knock on her front door. She asked who was there, and a voice answered, “Antwon”; she replied that she did not know anybody by that name, and rolled her wheelchair away from the door. She called 911, and a little while later police lights and a siren passed the front of her apartment, but nobody came to the door. She got back on the phone with her friend when suddenly her lights went out and phone died. She heard a “rumbling” at the back door, followed by the sound of soda cans tumbling to the floor; she knew that someone had broken in through that window and stepped on the cans stacked under it. She began screaming, but her next door neighbor was out of town so nobody heard her.
The intruder came directly to MJ, picked her up out of the wheelchair, set her on the floor and demanded money. MJ pleaded that she did not have any, as she had not yet cashed her check; however, the intruder threatened that if she did not hand over $20, he would rape her. She offered her bank card, but the intruder would not take it; panicking, she said she might have lasóme coins somewhere. He dragged her by her one leg to- the *1048 kitchen, where she began opening cabinets and pulling things out, but she could not find the coins. He then dragged her to the living room and raped her; dragged her to the bedroom and raped her; and finally dragged her to the living room and raped her again. He then went to the kitchen, where MJ heard some coins rattling in a tin can; she surmised he had found the coins she had not been able to locate earlier. The intruder then left the apartment.
MJ testified that because the lights were out she could not see the intruder well, but she could tell he was wearing a scarf around his face and rubber gloves on his hands. After he left, she crawled back to her wheelchair and went to the apartment office, where she called the police.
Police Chief G. Wesley Horton and Officer Christopher Walker testified that they responded to a 911 call, with Deputy Paul Trosclair of the Jackson Parish Sheriffs Office, at MJ’s apartment early that morning. They did not say why, but they left and went down the street to Kristen Rat-cliffs apartment in the project. Ms. Rat-cliff consented to let them come in; there, they saw Jackson standing totally nude, next to a pile of wet clothing, including a striped polo shirt.[1] They took Jackson and Ms. Ratcliff to the JPD for questioning.
Later that day, Chief Horton returned to MJ’s apartment and tried, unsuccessfully, to lift fingerprints from the electrical box, windowsill and interior of the apartment, but he confirmed that the electrical box was open and power had been cut off. He found a shoeprint on MJ’s front door; 13 Officer Walker photographed it, and the door was removed to make an impression of the print. Walker also took several photos of the interior and exterior of the apartment.
The officers then returned to Ms. Rat-cliffs apartment; she consented to a search. Under the kitchen sink, they found several coins, some loose in a plastic bag, some in a felt bag and some in paper rolls; they seized these. They also noticed, on the floor, a pair of flip-flops with treads resembling the shoeprint on MJ’s front door; they seized the flip-flops.
Officer Walker went to the hospital and asked MJ to describe the coins; she did so “to a tee,” mostly older coins of sentimental value to her. He showed her the coins, and she confirmed they were hers. With this and other investigative information, Officer Walker swore out a warrant for Jackson’s arrest.[2]

Procedural History and Trial Testimony

In September 2009, the Jackson Parish grand jury indicted Jackson on one count each of aggravated rape and aggravated burglary.[3] Jackson filed motions to suppress the physical evidence seized from Ms. Ratcliffs apartment, the results of the voice lineup and certain statements made by Jackson at the correctional center. After a hearing in August 2010, the district *1049 court denied all motions to suppress, and these rulings are not 14designated as errors on appeal.[4]
At trial in September 2011, MJ and the police officers testified as outlined above. In addition, the state called Michael Stelly, an expert in fingerprint and footprint analysis. Stelly examined the latent shoeprint found on MJ’s front door and the flip-flops seized from Ms. Ratcliffs apartment. Although he could not make an individual match, he testified that the print on the door was consistent with the tread of the right flip-flop. He also testified that the impression on the door showed a mark where the heel overhung the sole of the flip-flop. He concluded that the portion of the heel print on the door matched the exemplar of Jackson’s footprint. The state introduced photos of Jackson’s foot in the flip-flop; the heel almost completely overhangs the end of the rubber sole.[5]
The state also called Dr. Dirk Rainwater, the emergency room doctor who examined and treated MJ on the morning of the incident. MJ told him she had been assaulted and raped; she was very upset and anxious. Dr. Rainwater found bruising on her buttocks and irritation in her genital area, which he described as “nothing inconsistent” with the history she gave.
Finally, the state called two lay witnesses. Kristen Ratcliff testified that in 2009 she was living in the project with Jackson; she identified him in open court. She admitted that she let the police search her apartment and that they found some coins which she had never seen before and did not put there. Douglas Stringfellow, who lived on Congo Street not far from IsHarvey Place, admitted that a JPD officer stopped and questioned him early on the morning of July 7, but denied that he ever tried to break into anybody’s apartment, knock on their door or steal their money.
The defense called Dr. Jessica Esparza, an expert in DNA analysis, who examined the rape kit of MJ taken at the emergency room on July 7, 2009, as well as oral swabs from MJ and Jackson. Dr. Esparza testified that MJ was positively excluded as a donor of any of the DNA found in the rape kit. In fact, she concluded, all the rape kit swabs — perineal, anal, vaginal and cervical — tested negative for male DNA.
The defense also called Officer Matthew Nash of the JPD, who established the timeline: MJ’s first 911 call was at 4:16 а.m.; an officer arrived at the scene at 4:19; the officer stopped and questioned a man named Stringfellow, but by 4:29 released him when he said he was merely walking home; and MJ’s second call, from a different phone, was at 6:04. The second call described the assailant as a heavyset black man wearing a mask and a striped shirt.
After an hour and 46 minutes’ deliberation, the jury found Jackson not guilty of aggravated rape but guilty as charged of aggravated burglary. Both verdicts were 10-2.[6]
The state then charged Jackson as a fourth felony offender, citing his February 18, 2003, guilty plea to four counts of forgery; his November 15, 2004, guilty plea to one count of aggravated battery; *1050 and his November 15, 2004, no contest plea to five counts of simple burglary and one of simple | r,burglary of an inhabited dwelling, and guilty plea to two additional counts of simple burglary and one of simple burglary of an inhabited dwelling. After a hearing in April 2012, the district court adjudicated him an habitual offender. At sentencing in May 2012, the court cited aggravating and mitigating factors gleaned from Jackson’s PSI, and initially sentenced him to 30 years at hard labor; however, the court vacated this and imposed the mandatory life sentence at hard labor without benefits for a fourth felony offender with two prior crimes of violence.
Defense counsel filed a motion to reconsider sentence, which the district court denied. This appeal followed.

Discussion: Sufficiency of the Evidence

By his first assignment of error, Jackson urges the evidence was insufficient to convict him of aggravated burglary. He contends that because the jury acquitted him of aggravated rape, it must have rejected MJ’s testimony, at least in part. He suggests that owing to the profusion of inconsistencies in her account, any rational finder of fact should have rejected it in its entirety. He cites: (1) her claim that she first called the police at 3:00 a.m., versus the police log showing it was over an hour later, at 4:16 a.m.; (2) her testimony that the man at the door said his name was “Antwon,” versus her report to Dr. Rainwater that it was “Anthony,” and she never used his true name, “Antonio”; (3) her report to police that she was raped vaginally, orally and anally, versus her testimony describing only vaginal rape; (4) her testimony that the rapes occurred first in the living room, then in the bedroom, then in the living room, versus her statement to Dr. Rainwater that the first was in the bedroom, and the others in the living 17room; (5) her description of the size of the stripes on Jackson’s shirt, versus the stripes on the actual shirt; (6) her testimony that the intruder tried to kick in the back door, versus the shoeprint found on the front door; and (7) her testimony that the intruder knocked over soda cans under the window versus the police photos showing the cans still neatly stacked. He also cites the absence of fingerprints or DNA from the interior or exterior of MJ’s apartment, and the absence of mud, water or debris on the floor, despite the officers’ testimony that it had been raining that night. He contends that the record shows, at most, that Jackson may have accidentally kicked on MJ’s front door, thinking it was Ms. Ratcliffs, but that he moved along, and somebody else came by and committed the crime an hour or so later. He offers as a reasonable hypothesis of innocence that Ms. Rat-cliff, or another friend of hers, stole the coins earlier and stashed them under her counter. Finally, he reiterates that MJ’s claims of multiple rape were completely refuted by Dr. Esparza’s DNA testing; this, with the raft of inconsistencies in the trial testimony, mandate a finding of insufficient evidence.
The state responds that the jury properly disregarded the portion of MJ’s testimony that was disproved by the DNA evidence, but had a rational basis to accept the portion that described the aggravated burglary. The state cites four salient points: (1) Jackson’s heel print was found on MJ’s front door; (2) the electrical box was disconnected, allowing the intruder to enter under cover of darkness; (3) MJ’s “unusual collection of coins”[7] was found *1051 |8in Ms. Ratcliffs apartment, where Jackson was staying; and (4) medical evidence showed that MJ had indeed been dragged around her home during the burglary, as she testified. The state concludes that the evidence supports the verdict.
The standard of appellate review for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier or fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. State v. Pigford 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App. 2 Cir. 1/14/09), 1 So.3d 833, writ denied, 2009-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Dorsey, 2010-0216 (La.9/7/11), 74 So.2d 603; State v. Knight, 45,231 (La.App. 2 Cir. 5/19/10), 36 So.3d 1163, writ denied 2010-1425 (La.1/14/11), 52 So.3d 899. A reviewing court pays great deference to the jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Williams, 2007-1407 (La.10/20/09), 22 So.3d 867; State v. Hill, 42,025 (La.App. 2 Cir. 5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529. A reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Sosa, 2005-0213 (La.1/19/06), 921 So.2d 94; State v. Cunningham, 46,664 (La.App. 2 Cir. 11/2/11), 77 So.3d 477. In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Higgins, 2003-1980 (La.4/1/05), 898 So.2d 1219; State v. Cunningham, supra.
Generally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue. State v. Lilly, 468 So.2d 1154 (La.1985). Circumstantial evidence, by contrast, consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. Id.; State v. Bounds, 38,330 (La.App. 2 Cir. 5/12/04), 873 So.2d 901. A person in unexplained possession of recently stolen property is presumed to be the thief, in the absence of other evidence creating a reasonable hypothesis of innocence. La. R.S. 15:432; State v. Muse, 363 So.2d 462 (La.1978). When a conviction is based on circumstantial evidence, such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; State v. Dorsey, 2010-0216 (La.9/7/11), 74 So.3d 603.
As pertains to this case, aggravated burglary is defined as the unauthorized entering of any inhabited dwelling, with the intent to commit a felony or any theft therein, if the offender commits a battery upon any person while in such place. La. R.S. 14:60. Battery is defined, in pertinent part, as the intentional use of force or violence upon the person of another. La. R.S. 14:33.
[inWe acknowledge the discrepancies between MJ’s testimony and the other evidence, but find enough corroboration to support the conviction. She testified that *1052 somebody disconnected the lights and phone before breaking in, a point confirmed by Chief Horton and Officer Walker. She testified that the intruder demanded money and dragged her around the apartment by her one leg, a point confirmed by Dr. Rainwater’s finding of bruising on her buttocks. She testified that the intruder carried off her identifiable accumulation of older coins, which officers found in Ms. Ratcliffs kitchen. These facts satisfy the elements of an unauthorized entering of MJ’s apartment, with the intent to commit a theft therein, and with the offender committing a battery on MJ while inside.
Although the apartment was dark, MJ told the JPD dispatcher that the intruder was wearing a striped shirt; officers entering Ms. Ratcliffs unit found Jackson standing next to a striped shirt he had just removed and thrown to the floor. Ms. Ratcliff testified that she did not put the coins in her kitchen, leaving her boyfriend Jackson as the only person who could have done so. Officers also found Jackson’s shoeprint and partial heel print on MJ’s front door. An initial suspect, String-fellow, was released, and he testified he did not break into the apartment. These facts satisfy the element of identity, proving that Jackson committed the crime, not some other person (such as Stringfellow) who might have skillfully planted Jackson’s shoeprint and stashed the coins in such as way as to mislead officers.
The jury obviously saw that MJ was disabled, sickly, unable to sleep, and suddenly thrown into pitch darkness when her ordeal began, and that these facts might impair her ability to discern, for example, which door the h intruder was kicking which time, or whether the soda cartons actually fell to the floor or were merely jostled in place. The jury also saw the gaping discrepancy that arose when Dr. Esparza found absolutely none of Jackson’s DNA in MJ’s rape kit, but it chose to accept those parts of her testimony that found corroboration in the other evidence. We will not disturb the jury’s rational credibility call. State v. Williams, supra; State v. Hill, supra. This assignment of error lacks merit.

Excessive Sentence

By his second assignment of error, Jackson urges his life sentence is excessive. He concedes that the minimum sentences prescribed by the habitual offender statute are constitutional and when a mandatory sentence is prescribed, the trial court is not required to comply with the guidelines of La. C. Cr. P. art. 894.1. However, he urges that the appellate court should consider any mitigating factors to determine whether the defendant is entitled to a downward deviation under State v. Williams, 2007-1111 (La.12/7/07), 969 So.2d 1251. He beseeches this court to avoid the “automated verbiage or knee-jerk terminology” routinely deployed to affirm sentences within the statutory range, citing dissents in State v. Jackson, 2009-2406 (La.1/19/11), 55 So.3d 767 (Knoll, J., dissenting), and State v. Jackson, 11-923 (La.App. 3 Cir. 6/6/12), 92 So.3d 1243 (Thibodeaux, C.J., dissenting), writ denied, 2012-1540 (La.1/18/13), 107 So.3d 626. Finally, he argues that the district court initially sentenced him to 30 years, and nothing at the habitual offender hearing changed the facts of the case; he submits that the weak evidence at trial, and the six years since the last predicate felonies, would support a downward deviation to 30 years.
112The state responds that because the instant offense and two of the prior offenses were crimes of violence, the life sentence was mandated by La. R.S. 15:529.1 A(4)(b). It urges that Jackson’s criminal history (with convictions for ag *1053 gravated battery, aggravated burglary, forgery, felony theft, burglary of an inhabited dwelling and simple burglary) shows his propensity to enter other people’s homes, steal from them and wreak physical and emotional harm. It submits that nothing in this record supports a downward departure.
Ordinarily, review of sentences for excessiveness is a two-step process, the first being an examination of the district court’s compliance with the guidelines of La. C. Cr. P. art. 894.1. State v. Smith, 433 So.2d 688 (La.1983). However, when there is a mandatory sentence, the district court is not required to justify under Art. 894.1 the sentence it is legally required to impose. State v. Thomas, 41,734 (La.App. 2 Cir. 1/24/07), 948 So.2d 1151, and citations therein; State v. Rose, 606 So.2d 845 (La.App. 2 Cir.1992). Nevertheless, the district court conducted an exhaustive analysis of the 894.1 factors, noting that Jackson did not use a dangerous weapon and did not commit a “major economic crime,” but finding that the aggravating factors predominated. We find adequate compliance with the guidelines, even if such was not required.
The second step is a review for constitutional excessiveness. A sentence violates La. Const. Art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless imposition of pain and suffering. State v. Smith, 2001-2574 (La.1/14/03), 839 So.2d 1. A sentence is deemed grossly disproportionate if, 113when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice or makes no reasonable contribution to acceptable penal goals. State v. Guzman, 99-1528 (La.5/16/00), 769 So.2d 1158. The habitual offender law has been found constitutional in its entirety, and the minimum sentences it imposes are also presumed to be constitutional. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672; State v. Thomas, supra. The burden is on the defendant to rebut the presumption that a mandatory minimum sentence is constitutional by “clearly and convincingly” showing that he is exceptional. Id. In State v. Johnson, supra, the supreme court held that lack of violence cannot be the only reason, or even the major reason, for declaring a sentence excessive. Lack of violence obviously has no application to the instant ease.
The state correctly shows that the instant offense is a crime of violence, La. R.S. 14:2B(20), and that two of his predicate offenses, simple burglary and simple burglary of an inhabited dwelling, carry sentences of 12 years or more,' La. R.S. 14:62B, 62.2, thus invoking the mandatory life sentence of R.S. 15:529.1A(4)(b). Moreover, the record does not show, and surely not clearly and convincingly, that Jackson is exceptional. With the district court, we find the aggravating factors greatly outweigh any mitigating ones. His first predicate offense, a guilty plea entered in February 2003, was to four counts of forgery, and his third predicate, a plea (guilty and no-contest) entered in November 2004, was to six counts of simple burglary and three counts of simple burglary of an inhabited dwelling, an astonishing II felonies in the nine years before the instant offense. The PSI shows that Jackson satisfactorily completed a one-month 114release for good time in 2007, but two other probationary terms were revoked for criminal conduct. This record shows that Jackson was indeed the kind of offender the legislature contemplated when it mandated life in prison for fourth felony offenders under § 529.1A(4)(b). This exception lacks merit.

Conclusion

Jackson finally argues, as an error patent, that at the habitual offender hear *1054 ing the district court failed to advise him of his right to remain silent, contrary to La. R.S. 15:529.1D(1)(a). He concedes that because he did in fact exercise his right to remain silent, the error is harmless, State v. Timmons, 44,702 (La.App. 2 Cir. 9/23/09), 22 So.3d 1074, writ denied, 2009-2251 (La.4/16/10), 31 So.3d 1053, but suggests that in cumulation with other trial errors, it would support reversal. We agree that the error was harmless and find, as we did in Timmons, that it had no prejudicial effect on any of Jackson’s substantive rights.
We have reviewed the entire record and find nothing else we consider to be error patent. La. C. Cr. P. art. 920(2). For the reasons expressed, Jackson’s conviction, adjudication and sentence are affirmed.
AFFIRMED.

. Chief Horton and Officer Walker both testified that it had been raining in the evening before this incident.

. The other information was a voice lineup in which a sheriff's deputy got Jackson and four other randomly selected black males from the correctional center to call out the name "Ant-won” and repeat a series of phrases. Dep. Horton brought this to the hospital and played it for MJ, who immediately identified Voice No. 2 as the person who broke into her apartment, threatened and raped her. Voice No. 2 was Jackson.

.The indictment also charged him with one count of pandering, involving Ms. Ratcliff, but pursuant to the defense's motion to quash, this charge was severed and no mention of it was made at trial.

. In spite of these rulings, the state offered no evidence at trial of the voice lineup or of Jackson's post-arrest statements.

. The photos, admitted as Exhibits S-35, 36 and 37, were taken by Officer Walker at the JPD.

. Jackson filed a pro se motion for post verdict judgment of acquittal, which trial counsel adopted, urging insufficiency of evidence. The district court ultimately denied it.

. Photos, admitted as Exhibits S-39, 40 and 41, show the felt bag, two rolls each of nickels and dimes, and a number of loose coins, including several silver dollars, half dollars and dimes of obsolete designs that have not been minted in over 60 years, as well as silver *1051 half dollars, quarters and dimes not minted in over 40 years.