591 So.2d 1208 (1991)
STATE of Louisiana, Appellee,
v.
Freeman E. TUCKER, III, Appellant.
No. 22961-KA.
Court of Appeal of Louisiana, Second Circuit.
December 6, 1991.
Writ Denied March 26, 1992.
*1211 John M. Lawrence, Indigent Defender Office, Shreveport, for appellant.
William J. Guste, Jr., Atty. Gen., Baton Rouge, Paul J. Carmouche, Dist. Atty., Catherine M. Estopinal, Asst. Dist. Atty., Shreveport, for appellee.
Before MARVIN, HIGHTOWER, and STEWART, JJ.
HIGHTOWER, Judge.
Defendant, Freeman E. Tucker, III, pled not guilty after being accused by bill of information with three armed robberies, LSA-R.S. 14:64. A jury convicted him of two counts, as charged, and one count of first degree robbery, LSA-R.S. 14:64.1. The trial judge ordered imprisonment at hard labor for 45 years on each armed robbery and 30 years on the other offense, with all three terms to be served consecutively and without benefit of probation, parole or suspension of sentence. Defendant now appeals. Finding no merit in his 17 assignments of error, we affirm the convictions and sentences.

FACTS
At approximately 9:30 p.m. on April 16, 1988, a man robbed Sue Isbel, the cashier at Gulf Magik Mart on Youree Drive in Shreveport. The perpetrator, later identified as defendant, entered the store and asked for a pack of Salem Lights. As the clerk placed the cigarettes on the counter, the customer removed his hands from his pockets, revealing that he wore surgical gloves. In response to Ms. Isbel's surprised reaction, defendant quickly grabbed her from behind. Placing an ordinary serrated steak knife to her throat with one hand and covering her eyes with his other hand, he forced her to open the cash register. He then proceeded to take from the store an amount of cash and several blank money orders, together with a green Commercial National Bank money bag.
To the authorities, Ms. Isbel soon reported the culprit as a black male, wearing a sweater-type jacket and a "Gilligan-type" hat. When subsequently asked to view a video lineup, she made no identification. However, upon attending a physical showing of several males at the jail on May 13, 1988, she selected defendant as most resembling the offender, but could not be positive. Later, while waiting to testify at *1212 a hearing on December 19, 1988, upon observing defendant and other prisoners enter the courtroom, she became convinced he committed the crime. At trial, she testified categorically that he robbed her on April 16, 1988.
At approximately 10:00 p.m. on May 1, 1988, a man entered the Pel-State Fina Station on Flournoy-Lucas Road in Shreveport and removed a soft drink container from the cooler. Placing the bottle on the counter, he quickly sprang into the check-out area and positioned a knife to the throat of the cashier, Catherine Ramsey. After demanding the store's money and obtaining approximately $100 in small bills, the robber fled when another customer arrived to purchase gasoline. Ms. Ramsey could never make a positive identification, but fingerprints taken from the bottle later matched those of defendant.
On May 11, 1988, Gracey Wyatt worked as cashier at a Texaco gas station on Mansfield Road in Shreveport. At approximately 9:00 p.m., a black male entered and requested transmission fluid of a specific type. Discovering the store had none, he instead bought a Coke and left. A short time later he returned, saying he had finally decided to buy the product in stock. When Ms. Wyatt momentarily turned, the man grabbed her from behind, quickly knocking away her glasses and covering her eyes with his hand. The assailant then held a sharp instrument against her neck, and verbally threatened to cut her throat if she did not give him the store's money. After receiving cash from the register and a special drawer, he forced the victim into a storage room and fled the scene. An entering customer observed the exiting robber and his vehicle.
Earlier on the evening of May 11, as part of a surveillance effort designed to counter the rash of gas station robberies,[1] Detective Travis Hayes began patrolling his assigned area of the city. About 9:20 p.m., he heard a police radio report of the Texaco gas station robbery. It described the perpetrator as a black male, approximately 5 feet 7 inches tall, weighing about 170 pounds, wearing a blue khaki shirt and blue pants, and driving an older model yellow car (possibly a Cadillac or Lincoln) with black side molding. Previous robberies had also provided a general description indicating the offender wore a hat.
About an hour after the report, Det. Hayes observed such a vehicle traveling eastbound on Pierremont Avenue, driven by a black male wearing a "Gilligan-type" or roll-up style hat. The officer followed and requested a license check, which soon disclosed that the car displayed expired tags. Upon stopping the 1975 Cadillac to issue a traffic citation, he discovered that the license plate had actually been altered to make the 1986 date read "1988," and also that the inspection sticker had expired. Neither could the driver produce a current registration, nor any proof of ownership.
Det. Hayes eventually issued three citations. Following standard departmental procedure with reference to impoundment, he radioed for a wrecker and inventoried the contents of the car. Among other items, he located a green CNB bank bag, a quart of Texaco motor oil, and a serrated steak knife. Beneath the driver's seat and stuffed into another area, he discovered three ten-dollar bills, four five's, and twenty-five one's. Shortly, the detective allowed retrieval of a tool box and returned the cash to the driver, whom he then transported home.
From a photographic lineup shown her the next day, Ms. Wyatt positively identified the driver, Freeman E. Tucker, III, as the perpetrator of the Texaco robbery. Upon subsequently executing arrest and search warrants, police quickly linked defendant to all three offenses.

DISCUSSION

Suppression of Identifications
Only Ms. Wyatt made a positive identification from the photographic lineup; however, at trial, both she and Ms. Isbel pointed out defendant as the person who robbed *1213 them. In the first assignment of error, defendant complains of the denial of his motion to suppress evidence of the photographic lineup, which he challenged as being impermissibly suggestive. Specifically, he maintained his picture to be the only one "where teeth are showing." He also sought to have the trial court suppress evidence stemming from the video identification process, as well as any in-court identifications by the two mentioned victims. A separate but related assignment, number eight, concerns solely the introduction into evidence of the photo display itself.
Reliability, as shown by the totality of the circumstances, is the linchpin when deciding admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). In attempting to suppress a pre-trial identification, a defendant must first show a suggestive identification procedure and, secondly, demonstrate the likelihood of misidentification by the eyewitness. Thus, even in cases of a suggestive out-of-court procedure, identification testimony will be admissible if found to be reliable under the total circumstances. Manson, supra; State v. Guillot, 353 So.2d 1005 (La.1977), writ denied, 367 So.2d 864 (La. 1979); State v. Mims, 501 So.2d 962 (La. App. 2d Cir.1987).
A lineup is unduly suggestive if the procedure focuses attention on the defendant. State v. Robinson, 386 So.2d 1374 (La.1980). For example, distinguishing marks on the photos may single out the accused, or suggestiveness can arise if sufficient resemblance of physical characteristics and features does not reasonably test identification. Id.
In deciding the reliability of an identification, several factors are usually considered, including:
the opportunity of the witness to view the criminal at the time of the crime, the witness' [sic] degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.
Manson, 97 S.Ct. at 2253.
After obtaining a polaroid snapshot of defendant standing in front of a height chart in the Red River Parish Sheriff's Office, Detective Danny Fogger selected five other photographs to use in the lineup. In an effort to keep the grouping as neutral as possible, the officer shot a polaroid photo of each picture; then cropped out all background features, such as the height chart, leaving only silhouette portrayals of the six individuals; and finally pasted the resulting photographs onto a sheet of paper to be uniformly presented as a six-subject display.
Examination of the display corroborates Det. Fogger's testimony that he painstakingly selected and exhibited photographs of six black males with the same general physical characteristics. Indeed, defendant does not even concern himself with that question. Instead, he relies solely on the fact that in only his photo are the subject's teeth showing. [Actually, defendant is the only smiling subject.] That factor alone, however, does not unduly focus attention on defendant. More to the point, he has fallen woefully short of substantiating his claim of suggestiveness.
Further, applying the Manson reliability standards with respect to Ms. Wyatt's in-court identification, the facts also support admissibility. The robbery transpired in a brightly illuminated Texaco gas station after the cashier twice talked with defendant during two trips into the store. Ms. Wyatt, at the time of the first visit, even expressly empathized with him over the inconvenience of having transmission problems. Upon the second arrival, she again spoke with him before he came around the counter and grabbed her. Notwithstanding the removal of her glasses during the struggle, the evidence does not demonstrate an inability by the victim to make a clear identification during the events of the robbery.
Considering the totality of circumstances regarding the photographic lineup and Ms. Wyatt's identification, the record fails to *1214 demonstrate a substantial likelihood of misidentification.
Ms. Isbel apparently did not view the photographic lineup and made no identification from the video. Nor is there any showing of suggestiveness in the physical lineup, where she gave a tentative response. She observed her assailant for about thirty seconds inside the store and subsequently gave a description of his clothing to officers. She explained that her equivocation during the physical identification procedure actually resulted from confusion engendered earlier, when she saw a familiar face on the video, the face of an accused in an unrelated, highly publicized murder case. Later, prior to the suppression hearing, she immediately recognized the robber as he entered the courtroom with two other prisoners. Thereafter, she demonstrated a high degree of certainty in her testimony.
None of the identification testimony is shown as violative of defendant's due process rights, nor did the trial court err in denying the motion to suppress. Likewise, contrary to the eighth assignment of error, the district judge properly overruled the defense objection to state exhibit Number 1, the six-subject photo display.
These two assignments lack merit.

Jury Venire
The third assignment of error argues that the defense motion to quash the jury venire, premised on underrepresentation of minorities, should have been granted.
LSA-C.Cr.P. Art. 419 A provides that a jury venire "shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venire solely upon the basis of race." The defense, logically, bears the burden of proving the grounds for setting aside the venire. State v. Lee, 559 So.2d 1310 (La.1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991); State v. Liner, 397 So.2d 506 (La. 1981); State v. Manning, 380 So.2d 54 (La.1980). Such proof requires showing more than simple underrepresentation of blacks on the petit jury venire. Manning, supra; State v. Anderson, 315 So.2d 266 (La.1975).
In support of the present contention, nothing is provided other than defense counsel's assertion that he believed Caddo Parish to have a 45 percent black voting population. When the trial judge stated that he understood the correct number to be approximately 28 percent, the attorney lowered his estimation to 35 percent. Defendant additionally notes in brief that the venire had a total of eleven blacks.
Simply put, defendant clearly failed to prove sufficient grounds for setting aside the venire. This assignment thus lacks merit.

Voir Dire Questioning
The fourth assignment complains that the trial court denied a motion for mistrial based upon the prosecutor's question to a prospective juror. Defendant contends the inquiry, posed during voir dire, focused prejudicial attention on the fact that he might not testify in his own defense.
The record discloses that when the assistant district attorney asked:
Q. Let me ask you if you remember this back in the 1960's. You said you served on a jury. They voted 12-12 guilty. Right? Did that person take the stand?
defense counsel objected and moved for mistrial pursuant to LSA-C.Cr.P. Art. 770(3).
To mandate a mistrial, the reference must be intended to draw the attention of the jury to the defendant's failure to testify. LSA-C.Cr.P. Art. 770(3); State v. Johnson, 426 So.2d 95 (La.1983); State v. Morton, 483 So.2d 174 (La.App. 2d Cir. 1986).
Here, at the stage of trial involved, defendant had not yet elected whether to testify or not. The prospective juror had served as a juryman on a criminal case in the sixties, and the query concerned whether *1215 that earlier defendant took the stand. The prosecutor apparently sought to explore the venireman's previous experience at addressing issues of credibility and reasonable doubt. Cf. Morton, supra. Follow-up questioning clearly advanced in that direction. Thus, review of the inquiry in its proper context reveals no intent by the state to call attention to defendant's failure to testify.
This assignment lacks merit.

Batson Objections
Defendant's fifth assignment contends the trial court erred by overruling his Batson objection to peremptory challenges excusing three black potential jurors, viz., Marilyn Sue Fortson, Vernita Watson, and Lessie H. McCoy.
The holding of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), is codified in our law as LSA-C.Cr.P. Art. 795 C, which provides that a peremptory challenge by the state shall not be based solely on the race of a prospective juror. To make a Batson contention, a defendant is required to establish a prima facie case of purposeful discrimination. In so doing, he must show that pertinent circumstances raise an inference that the prosecutor used peremptory challenges to exclude venire members of a cognizable racial group from the jury solely on the basis of race. Batson, supra; State v. Collier, 553 So.2d 815 (La.1989). A criminal defendant may object to race-based exclusions, however, irrespective of whether he and the excluded juror share the same race. Powers v. Ohio, ___ U.S. ___, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).
Upon a showing of prima facie discrimination, the burden then shifts to the state to come forward with a neutral explanation for challenging the jurors. While that explanation need not rise to the level of a challenge for cause, State v. Young, 551 So.2d 695 (La.App. 1st Cir.1989); State v. Williams, 545 So.2d 651 (La.App. 5th Cir.1989), writs denied, 556 So.2d 53 (La. 1990), 584 So.2d 1157 (La.1991), a prosecutor does not meet that onus by merely stating his assumption or intuitive judgment that the excused jurors would be partial to the defendant because of their shared racial identity, State v. Jackson, 548 So.2d 29 (La.App. 5th Cir.1989).
As circumstances, the present record establishes that the state exercised only four peremptory challenges, striking three black females and one white female. Defense counsel excused at least four white venire persons. Four blacks actually served on the jury.
Preparing to make the point that the ultimate issue of deciding guilt or innocence would rest solely with the jury, the assistant district attorney questioned each prospective juror as to whether they knew who Harry Truman was. Ms. Fortson initially answered in the affirmative but, when asked specifically, she said, "I can't think right now." The prosecutor proceeded to theorize that with respect to the jury, just as stated by Truman, "The buck stops here."
Later, in response to the Batson complaint, the prosecutor explained that he excused Ms. Fortson because he considered her responses less than fully candid. The fact that the state does not believe some of a prospective juror's answers is a racially neutral reason for exercising a peremptory challenge. State v. Hall, 549 So.2d 373 (La.App. 2d Cir.1989), writ denied, 556 So.2d 1259 (La.1990).
Ms. Fortson also stated that she had a lot of things on her mind, might not be able to concentrate, and did not understand the concept of specific intent. Each of these statements, although not mentioned by the state, nor here relied upon, would have further supported a racially neutral peremptory challenge. See State v. Wiley, 513 So.2d 849 (La.App. 2d Cir. 1987), writ denied, 522 So.2d 1092 (La. 1988); State v. Willis, 552 So.2d 39 (La. App. 3d Cir.1989), writ denied, 560 So.2d 20 (La.1990); State v. Worthy, 532 So.2d 541 (La.App. 1st Cir.1988), writ denied, 538 So.2d 610 (La.1989); State v. Gilmore, 522 So.2d 658 (La.App. 5th Cir.1988); State v. Manuel, 517 So.2d 374 (La.App. 5th Cir. *1216 1987), all concerning a perceived lack of interest or unresponsiveness. Likewise, see State v. Lindsey, 543 So.2d 886 (La. 1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990), dealing with the inability of a prospective juror to grasp the legal issues in the case.
Regarding Ms. Vernita Watson, the prosecutor said he challenged her based on perceived weak character traits, as reflected by her continued nervous glancing at defendant and general timidity. Ms. Watson had described herself as a "follower" and a "feeling person," and termed her only hobby as "spending money." The explanation given by the state impugns this prospective juror's ability to function as an independent trier of fact and decision-maker, a reason which is clear, neutral, reasonably specific, and related to the particular case at bar. See Collier, supra.
With respect to Lessie McCoy, defendant did not brief or argue his contention, which is accordingly considered abandoned. URCA 2-12.4; State v. Dewey, 408 So.2d 1255 (La.1982); State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), writ denied, 558 So.2d 1123 (La.1990). Further, the record shows that Ms. McCoy had severe medical problems, which necessitated that she take medication that made her sleepy. Certainly, this reflected a racially neutral reason for a peremptory strike. She also mentioned two brothers serving prison terms. Cf. Lindsey, supra.
The trial court determined that the defense failed to set forth a prima facie case of purposeful discrimination.[2] Cf., e.g., State v. Coutee, 545 So.2d 571 (La. App.2d Cir.1989), writ denied, 551 So.2d 1335 (La.1989); State v. Stewart, 530 So.2d 1263 (La.App. 2d Cir.1988). Such a conclusion by the trial judge merits great deference. Batson, 106 S.Ct. at 1724 n. 21; U.S. v. Romero-Reyna, 867 F.2d 834 (5th Cir. 1989), appeal after remand, 889 F.2d 559 (5th Cir.1989), cert. denied, 494 U.S. 1084, 110 S.Ct. 1818, 108 L.Ed.2d 948 (1990); Thomas v. Moore, 866 F.2d 803 (5th Cir. 1989), cert. denied, 493 U.S. 840, 110 S.Ct. 124, 107 L.Ed.2d 85 (1989). Besides, the present ruling is supported by the record. Moreover, the explanations of the prosecutor adequately reflect racially neutral reasons for the peremptory challenges in question.
We find no error in the denial of the three objections that are the subject of this assignment.

Hearsay Testimony
Assignment nine concerns a defense complaint in reference to hearsay testimony.
When asked on direct examination why he seized a particular item of physical evidence, Det. Fogger began, "Detective Hall had told me...." Defense counsel immediately interrupted with an objection, citing hearsay. The assistant district attorney answered that the remark did not constitute hearsay inasmuch as it simply explained the reasons for the actions of the officer, and did not seek to prove the truth of the matter asserted. See LSA-C.E. Art. 801 C.
Defendant failed to brief or otherwise support his argument pertaining to the overruling of his objection. This assignment is without merit.

Investigatory Stop, Subsequent Arrest and Searches
Arrest and search warrants issued on May 12 and May 16, based on Ms. Wyatt's positive photographic identification of the robber, together with the circumstances of the Texaco station robbery and Det. Hayes' observations that night. Execution of these orders resulted not only in defendant's arrest, but also in the seizure of a number of physical items from his vehicle and residence. Articles discovered, and later introduced into evidence, included five blank money orders with serial numbers matching those taken during the Gulf Magik *1217 Mart robbery; a green CNB money bag; two matching serrated steak knives, one each seized from the home and auto, and later identified as the same style used by the perpetrator; $287 in cash in an envelope; and various garments, including a hat similar to that described in connection with the April 16 offense. Officers also took photographs of the vehicle and certain objects before being moved.
Defendant complains in assignments 10 through 14 that, due to lack of probable cause for the initial stop, all of the items seized and various photographs should have been suppressed, as he so moved.
Probable cause, however, is not the issue. The right of a law enforcement officer to stop and interrogate one reasonably suspected of criminal conduct is recognized by LSA-C.Cr.P. Art. 215.1, and both federal and state jurisprudence. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Pautard, 485 So.2d 909 (La.1986). Reasonable cause for investigatory detention is something less than probable cause and must be determined, in each case, by whether the officer has sufficient knowledge of facts and circumstances to justify an infringement on the individual's right to be free from governmental interference. Pautard, supra.
In articulating his reasons for stopping the Cadillac, Det. Hayes testified he initially became suspicious because both the vehicle and operator matched the general description broadcast over the police radio about an hour earlier. Then, a license check disclosed that the tags had expired. Under these circumstances, reasonable cause for a valid stop clearly existed. Cf. State v. Washington, 540 So.2d 502 (La.App. 1st Cir.1989).
Upon lawfully stopping the car and driver, the officer verified the license violation by observing the previously described altered plate. He also discovered an expired inspection sticker. Further, although presenting an operator's license, defendant could provide only an obsolete registration in another person's name. Det. Hayes thus issued citations for the three violations. Additionally, since no proof of ownership could be produced, he initiated impoundment of the vehicle. Aided by a backup officer, he called for a tow truck and inventoried the contents of the automobile.
Like an investigatory stop, an inventory search is an exception to the warrant requirement recognized by federal and state jurisprudence. Colorado v. Bertine, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987); South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); State v. Jewell, 338 So.2d 633 (La.1976). It is not premised upon probable cause to secure evidence, but merely upon the necessity to safeguard the automobile and its contents, while also protecting the law enforcement agency against disputes over lost or stolen property. United States v. Griffin, 729 F.2d 475 (7th Cir.1984), cert. denied, 469 U.S. 830, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984), and citations therein. See also State v. Killcrease, 379 So.2d 737 (La.1980).
In this case, faced with an obviously altered plate, expired registration in the name of one other than the operator, and defendant's failure to produce any valid documentary evidence of ownership of the vehicle, Det. Hayes properly and prudently decided to impound the Cadillac. As part of that process, the standard procedures of his department dictated that an inventory ensue.
Hayes testified that the stop occurred on a busy highway adjacent to a school, that he summoned a tow truck before beginning the search, and that he followed routine procedures. The wrecker request and inventory sheet corroborate that testimony. Further, all of the contents remained in the car, with the exception of a "bong" seized as contraband pursuant to LSA-R.S. 40:1031 and 1033 C. The officers quickly returned certain items, including the discovered cash, to the operator and then drove him to his apartment. For a discussion of the significant factors considered by Louisiana courts in determining whether a true inventory search has occurred, see State v. Sims, 426 So.2d 148 (La.1983), and cases cited therein.
*1218 Although the inventory occurred in the field, without consent of the operator, all of the Sims elements need not be present to validate such a procedure. Furthermore, other conceivable arrangements to avoid impoundment appear generally impractical in this case. Only protective police custody could achieve the preservation of the car and its contents, while simultaneously securing the mobile asset pending determination of its ownership. Thus, the totality of the circumstances justified the impoundment and inventory search.
Given reasonable suspicion for the initial stop and a demonstrably lawful impoundment and inventory, the information gleaned by Det. Hayes in that process could correctly be used in the warrant applications. Moreover, even upon excising those details obtained through the inventory, the subject affidavits still establish probable cause. Hence, fruits of the resulting warrants are by no means tainted, as contended by defendant.
In sum, the trial court did not err in refusing to suppress the evidence in question, nor do any of these four assignments have merit.

EXCESSIVE SENTENCE
Assignment number 17 asserts that the trial judge failed to state the considerations and factual basis for the sentences, and also imposed an excessive term of imprisonment.
To evaluate such a contention, an appellate court utilizes a two-step process. First, it must be shown that the lower court adequately considered the criteria set forth in LSA-C.Cr.P. Art. 894.1. State v. Smith, 433 So.2d 688 (La.1983). See also State v. Jones, 398 So.2d 1049 (La.1981), for a listing of the important elements in that review. However, inadequate compliance need not result in a remand, provided the record as a whole clearly supports the sentence imposed. State v. Smith, 430 So.2d 31 (La.1983); State v. Griffin, 455 So.2d 681 (La.App. 2d Cir. 1984), writ denied, 458 So.2d 128 (La. 1984).
Before pronouncing sentence, the judge made reference to defendant's four previous felony convictions. These included adjudications of guilt for two counts of burglary in 1979, possession of stolen things in 1983, and middle grade theft in 1985. In view of that history, coupled with the present convictions, the sentencing judge elected not to seek a presentence investigation report. After reviewing the three recent crimes and the minimum-maximum sentences imposable, the court stated that the record sufficiently established the offender's unfitness for remaining in society.
The record additionally reveals defendant's age, marital and employment status, admission of drug use, and possession of drug paraphernalia. Also, the sentencing judge found any mitigating factors to be outweighed by the seriousness of the present, repeated offenses and the slim likelihood of rehabilitation. That conclusion appears based upon adequate consideration of the factors contained within Article 894.1.
In the second step of our analysis, we must determine whether the sentence is too severe, given the circumstances of the case and the background of the defendant. For a discussion of the parameters involved in that determination, see LSA-Const. Art. 1, § 20; State v. Barberousse, 480 So.2d 273 (La.1985); State v. Square, 433 So.2d 104 (La.1983); State v. Bonanno, 384 So.2d 355 (La.1980).
As to each armed robbery count, imposition of a term of hard labor imprisonment for not less than five years, nor more than 99 years, is mandated. LSA-R.S. 14:64. Likewise, the penalty for first degree robbery requires incarceration at hard labor for at least three years, but not more than forty years. LSA-R.S. 14:64.1. And, punishment for these offenses must be served without benefit of probation, parole or suspension of sentence.
The mid-range sentences before us cannot be considered excessive in light of the circumstances of this case. From a total 238-year exposure, the imposition of 120 years qualifies as a proper sentencing *1219 choice. Also, noting that the convictions stem from three separate incidents spanning a period of approximately one month, the resulting consecutive sentences do not constitute an abuse of discretion. See and compare State v. Thomas, 463 So.2d 94 (La.App. 3d Cir.1985), affirming consecutive 99 year sentences for two counts of armed robbery committed by a fourth felony offender; State v. Mosley, 466 So.2d 733 (La.App. 4th Cir.1985), writ denied, 468 So.2d 1202 (La.1985), affirming consecutive 99 year sentences for three counts of armed robbery; and State v. Franklin, 519 So.2d 292 (La.App. 5th Cir.1988), affirming a 198 year sentence for a second felony offender convicted of armed robbery.
This assignment is also without merit.

Abandoned Assignments
Defendant did not argue or brief the remaining assignments of error, numbers 2, 6, 7, 15, and 16. These complaints are thus considered abandoned. URCA 2-12.4; Dewey, supra; Kotwitz, supra.

CONCLUSION
Accordingly, finding no merit to any of defendant's assignments of error, we affirm his convictions and sentences.
AFFIRMED.
NOTES
[1] The preliminary examination discloses approximately nine such robberies, all occurring within a brief period and providing the same general description of the perpetrator.
[2] Of course, when the trial judge does not find a prima facie case pursuant to the Batson mandate, there is no necessity to call for the prosecutor's explanation. Nonetheless, most trial judges prefer to do so in order to create a full record as a precaution against a different appellate determination. Cf. Collier, supra, at 819 n. 5.