661 So.2d 603 (1995)
STATE of Louisiana, Appellee,
v.
Charles H. PARKER, Jr., Appellant.
No. 27417-KA.
Court of Appeal of Louisiana, Second Circuit.
September 27, 1995.
*605 Paul H. Kidd, Monroe, George M. Strickler, Jr., New Orleans, for appellant.
Richard Ieyoub, Attorney General, Baton Rouge, William R. Coenen, Jr., District Attorney, Johnny R. Boothe, Jr., Assistant District Attorney, Winnsboro, for appellee.
Before LINDSAY, BROWN and STEWART, JJ.
LINDSAY, Judge.
The defendant, Charles Parker, Jr., appeals his conviction and sentence for second degree murder. For the following reasons, we affirm.

FACTS
On Sunday, April 30, 1989, a motorist in rural Franklin Parish saw the body of the defendant's brother, Don Parker, lying in a ditch next to Hill Ridge Road. Parker had been shot repeatedly with a .22 caliber weapon.
Among the items found on Parker's body were his driver's license, a set of National Car Rental keys and a scrap of paper. Written on the scrap of paper was the name "Ellis Blunt," an FBI agent, and a phone number. Later that day, investigators contacted the Parker family and determined that Don was living in Monroe at a motel and worked for ALIC Insurance Company as a telemarketer. Officers then went to the motel where they found Don's rented Chevrolet Beretta. They also found a note on the door of the victim's motel room written by Michael Nellums, Don Parker's supervisor at ALIC. They discovered that both the victim's room and rental car were charged to the defendant, Charles Parker, Jr., the victim's brother.
Nellums, the vice-president of sales and marketing for ALIC, was the last person who admitted seeing the victim alive. Nellums *606 told investigators that he had borrowed the victim's car on Friday night and had spent some time on Saturday with the victim at Pecanland Mall in Monroe. Nellums stated that he last saw the victim at about 7 p.m. Saturday evening. The victim told Nellums that he was going to Winnsboro, but would be back at 10 or 11 p.m. that night. Nellums said that he went to the victim's motel room before 10 a.m. Sunday morning and that the victim's red Chevrolet Beretta was in the parking lot. Unable to locate the victim, Nellums left the note on the victim's motel room door. Nellums had an alibi for Saturday evening and was excluded as a suspect in the murder.
On May 4, the defendant, Charles Parker Jr., came to Franklin Parish and met with the Franklin Parish Sheriff, Eugene Parker[1] and Ellis Blunt, a Monroe-based special agent for the FBI. The defendant was a resident of Los Angeles, California and was not a subject of the investigation at the time. He told the investigators that he had twice phoned his brother on April 29, the day before the body was discovered. The investigators assumed that the defendant had called Don from Los Angeles. During that meeting, the defendant suggested several leads to the investigators which ultimately proved unproductive.
A day or two after the victim's funeral, Sheriff Parker again interviewed the defendant after learning that he had spent an extravagant amount of money on funeral flowers and was seen placing several hundred-dollar bills in his brother's casket. In that interview, the defendant stated that the victim had a $15,000.00 life insurance policy and that all the money was spent on the funeral. Defendant told the sheriff that this was the only insurance policy his brother had.
A few days later, a life insurance company called the sheriff's office requesting records pertaining to Don Parker's death for their policy investigation. Because this was a different policy than the one which paid for Don's funeral, the sheriff again interviewed the defendant about the life insurance on his brother. The defendant told the sheriff that he had forgotten about this $80,000.00 policy on Don's life and that he was sure there was no other insurance.
However, the sheriff continued to receive calls from other insurance agencies with policies on Don Parker's life. In each case, the defendant was the beneficiary. Ultimately, investigators determined that the defendant had taken out about $1 million in life insurance on his brother and that he had signed his brother's name on the policies. One particular call, from the J.C. Penney Insurance Company, led investigators to focus on the defendant as the prime suspect in the homicide. The J.C. Penney representative told an investigator that the defendant had been the beneficiary of an insurance policy on another man who had been murdered in California several years before. The circumstances of the instant case were similar to that killing and prompted Louisiana State Trooper Robert Buckley to contact Sergeant Richard Kalk of the Los Angeles Police Department on Friday, June 16, 1989.
Sgt. Kalk had been an investigator in the prior California murder, and was intrigued by the similarity between the two crimes. Trooper Buckley told Sgt. Kalk that the victim's car and motel room had been paid for by the defendant's American Express card. Remembering that the California murder had involved credit card fraud, Sgt. Kalk called the security office of American Express in Los Angeles after he got off the phone with Buckley. The American Express security officer, Maurice Rainey, examined the defendant's credit card records and told Sgt. Kalk that the defendant's American Express account had been turned over for collection. Mr. Rainey did not give Sgt. Kalk more specific information about this account, but promised to investigate the matter further.
A few days later, Trooper Buckley and Franklin Parish Deputy John Flowers flew to Los Angeles to meet with Sgt. Kalk. After the investigators arrived at the LAPD headquarters, Mr. Rainey, of American Express, called Sgt. Kalk and disclosed that the defendant had filed some 21 fraudulent applications *607 for American Express cards using fictitious names, employers and social security numbers. As a result of this fraud, American Express lost more than $34,000.
Realizing that American Express had been defrauded, Mr. Rainey gave Sgt. Kalk several pieces of substantive information from the defendant's credit card records. This information showed that the defendant had purchased two airline tickets to Jackson, Mississippi and had rented cars there, both the weekend before and the weekend of his brother's murder. The airline tickets were purchased under assumed names. Mr. Rainey also disclosed that on the night of the murder, the defendant had charged items at a gas station in Tallulah, Louisiana, and had made a purchase at a sporting goods store in Mississippi the previous weekend. On June 22, Sgt. Kalk went to American Express headquarters and picked up copies of the records. At this time, Mr. Rainey filed a formal credit card fraud complaint against the defendant on behalf of American Express.
On June 26, Trooper Buckley traveled to a sporting goods store in Jackson, Mississippi where the defendant had made a $203.94 credit card purchase on April 22. At the sporting goods store, Trooper Buckley learned that the defendant had purchased a Remington .22 rifle and, perhaps, some ammunition. With this information, and knowledge that the Tallulah gas station was close to the scene of the homicide, the defendant became the prime suspect in his brother's murder.
On July 17, 1989, police in Los Angeles arrested Charles Parker Jr. for the murder of his brother, Don. After obtaining a search warrant, police seized a number of the defendant's personal files, including credit card and telephone statements. From these records, investigators were able to develop more evidence. Telephone records led police to interview Tony Brown, a family friend of the Parkers and a resident of Goodman, Mississippi. Mr. Brown said that the defendant had called him from California in mid-April asking where he could buy a gun in Mississippi. On April 23rd, 1989, the defendant and another man that Parker introduced as "Duke," came from California and visited Mr. Brown at his apartment. ("Duke," whose real name is Oliver Williams, has also been charged in this murder but the state elected to try him separately from the defendant.) On this visit, the defendant left a Remington rifle and ammunition that he had just purchased at the sporting goods store with Tony Brown.
Mr. Brown said the men flew back to California later that morning but returned to Mississippi the following Saturday, April 29, 1989, the day of the murder. The defendant's credit card records reflected that he had rented a room in the Jackson, Mississippi Ramada Inn on April 29th. When the men returned to Brown's apartment, the defendant asked Mr. Brown for the rifle. Mr. Brown gave Duke the rifle, and Duke loaded it on Mr. Brown's kitchen table. As he was loading the weapon, Duke dropped a round of ammunition on Mr. Brown's kitchen floor. After the men left his house, Mr. Brown recovered the cartridge. He later gave it to investigators. The cartridge was the same type as those used in the murder.
Mr. Brown said that the men left with the weapon at about 4 P.M. and did not return. Mr. Brown told the investigators that following the defendant's arrest, the defendant contacted him and told him to lie to investigators about the purpose and location of the rifle.
Investigators later found the car that the defendant had rented on April 29th and discovered that the fibers in the car's carpet were consistent with fibers found on the victim's body. They also determined that Hill Ridge Road, where the body was found, was only about a mile from the Parker's boyhood home. Further, defendant's credit card records for the night of the murder reflected that he had purchased three meals and had made a call from the Tallulah Unocal station at about 10 P.M. He then made a telephone call from Rayville at 11:45 P.M. Hill Ridge Road is within the allotted drive time between those two locations. The weapon used in this crime was never found. However, experts testified that the bullets recovered from the victim's body could have been fired *608 from a weapon of the type the defendant bought the week before the murder.
The defendant testified at his trial. He stated that he was a long-time informant for the FBI. The defendant admitted that he was in northeast Louisiana the weekend of the murder, but said that he was attempting to gather evidence for the FBI on some drug dealers. He also claimed that his FBI agent-contact, Ralph DiFonso, could corroborate his testimony. However, the Department of Justice invoked a special FBI privilege preventing the agent from testifying.
The defendant also made statements and advanced theories by which he sought to implicate other possible suspects in his brother's death. There was no evidence to support his theories, and other witnesses testified that the victim acted normally the week before his death and had never mentioned anything which raised their suspicions. After hearing all the evidence, the jury found the defendant guilty as charged of second degree murder. He was subsequently sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. He appealed, asserting numerous assignments of error.[2]

MOTION TO SUPPRESS EVIDENCE
The defendant contends that the trial court erred in refusing to grant his motion to suppress the evidence obtained from American Express by the Los Angeles Police Department. He claims the records of his credit card transactions were derived from an unlawful police intrusion into those records.
He urges that the procedure used by the police to obtain his credit card records violated California statutory law and Louisiana constitutional law. Specifically, he complains that the police violated his rights under the California Right to Financial Privacy Act (CRFPA), Govt.Code Secs. 7470-7476 and under La. Const. Art. 1, Sec. 5 by failing to obtain a search warrant or subpoena for the records of his American Express transactions. These arguments are meritless.
As stated earlier, Trooper Buckley contacted Sgt. Kalk in Los Angeles. At that point, the similarities between the instant crime and the earlier murder in California became apparent. Because the California case involved credit card fraud, Sgt. Kalk contacted American Express to alert the company to the possibility that the same or similar situation may have occurred in Louisiana. Mr. Rainey, of American Express, responded that this did not appear to be the case. At that point, the contact between Sgt. Kalk and American Express ceased.
Later, after determining that the defendant had attempted to obtain numerous credit cards with fraudulent information, Mr. Rainey initiated a new contact with Sgt. Kalk. American Express discovered that it had been defrauded of approximately $34,000. At that point, American Express turned over the defendant's credit card records to the Los Angeles Police Department.
The trial court found that the submission of these records by American Express was allowable under California law and therefore denied the defendant's motion to suppress. The defendant argues that the trial court erred in its findings and interpretation of California law.
California Code Section 7470 generally prohibits disclosure of financial records without customer authorization, subpoena or search warrant. However, the following exception is provided:
(d) Except as provided in Section 7480, this section is not intended to preclude a state or local law enforcement agency from initiating contact with the financial institution if there is reason to believe that the financial institution is a victim of a crime. After such contact by a law enforcement agency, if the financial institution believes it is a victim of a crime, it may, in its discretion, disclose relevant financial records pursuant to Subdivision (c) of Section 7471.
Section 7471(c) provides:

*609 This section shall not preclude a financial institution, in its discretion, from initiating contact with, and thereafter communicating with and disclosing customer financial records to, appropriate state or local agencies concerning suspected violation of any law. [Emphasis supplied.]
Sgt. Kalk's initial contact with the institution was in the nature of a warning that the defendant had misused credit cards in the past. At the time the call was made, the defendant was still a free man, presumably still in possession of his credit cards. The call could have prevented further losses on the part of American Express by bringing the defendant to the company's attention. For these reasons, Sgt. Kalk's initial contact with American Express was legal and justified.
We further find that the release of the defendant's records by American Express was legally authorized. Both Sgt. Kalk and Mr. Rainey testified that American Express did not disclose Parker's financial records on the day that Sgt. Kalk first contacted the company. In fact, Sgt. Kalk testified that he did not expect to hear from American Express. Mr. Rainey called Sgt. Kalk only after he discovered that the defendant had filed numerous fraudulent credit card applications and had defrauded American Express of more than $34,000. Mr. Rainey testified that on that second call he gave Sgt. Kalk substantive information from the defendant's records because credit card fraud is a felony.
Also, American Express legally disclosed all of the defendant's records. Defendant argues that People v. Blair, 25 Cal.3d 640, 159 Cal.Rptr. 818, 602 P.2d 738 (1979), forbade the state from obtaining his entire file. In Blair, the California Supreme Court suppressed evidence of a defendant's credit card records obtained without valid legal process. The state argued that the disclosure was legal because the defendant had obtained the credit card under a false name. The court rejected this argument, stating that it is legal in California to use a false name "unless employed for a fraudulent purpose or in violation of a statute."
The instant case is distinguishable from Blair. In this case, it is evident that the defendant defrauded American Express, not only with false names but also by using false social security numbers and other information. There was no such evidence in Blair. Further, the individual records were relevant to show that American Express in fact extended credit to the defendant under a variety of names. Moreover, the individual transactions help verify the amount by which the defendant defrauded American Express. In that respect, they are "relevant" pursuant to CRFPA 7470(d) (and thus subject to disclosure) as they constitute evidence for a charge of fraud.
In the instant case, the trial court was correct in finding that Blair allows disclosure of financial records under the present circumstances, where the financial institution is a victim of wrongdoing. Also, California Code Section 7471, supra, allows the financial institution to disclose the financial records of customers "suspected of violation of any law."
Therefore, the trial court did not err in finding that California law allowed American Express to disclose the defendant's financial records.[3]

SUBPOENA TO WITNESS
The defendant argues that the trial court erred in failing to require his witness, FBI agent Ralph DiFonso, to testify. The defendant also argues that the court erred in failing to declare a mistrial when the United States asserted a privilege and refused to permit Mr. DiFonso to appear and testify.
Specifically, the defendant complains that the court should have granted him a recess to obtain the presence of the agent and that the court should have ordered the enforcement of his subpoena for the agent. He argues that the court's errors deprived him of his constitutionally guaranteed right to *610 compulsory process. U.S. Const.Amend. VI and XIV; La. Const. Art. 1, Sec. 16.
During the defense case, Parker asserted that his presence in Louisiana at the time of the murder was attributable to his work with the FBI. The defendant, testifying at the trial, claimed to be a long-time FBI informant involved in undercover operations which required the use of false names, social security numbers and addresses. Parker stated that he had worked with a succession of FBI agents, and his most recent agent-contact was Ralph DiFonso, a special agent stationed in New Haven, Connecticut.
Parker testified that, about 40 percent of the time, he initiates and develops cases for the FBI without that agency's instructions and that he is retroactively reimbursed for his investigatory expenses whenever the FBI accepts a case he has developed. Parker said that Agent DiFonso was aware of approximately 75 percent of these undercover operations.
In this context, defendant then explained his unusual actions from April 21, 1989 to April 30, 1989. However, the defendant's version of events was uncorroborated by the testimony of any other witness.
On February 17, 1994, while the trial was in progress, Judge Strong, at the defendant's request, issued a subpoena ad testificandum to Agent DiFonso in Connecticut. See LSA-C.Cr.P. Arts. 741-745. The record does not show whether the proper procedure was followed or whether the subpoena was actually issued to the agent. At any rate, the office of the Attorney General of the United States was notified of this subpoena. On February 18, an assistant U.S. Attorney for the Western District of Louisiana wrote a letter to the defendant, with copies sent to the court and the prosecutor, essentially refusing to allow Agent DiFonso to comply with the subpoena.
The legal basis for this refusal was 5 U.S.C. Sec. 301 and the regulations promulgated thereunder, 28 C.F.R. 16.21 et seq. The United States Attorney's Office gave 3 reasons why Agent DiFonso would not be permitted to appear:
1. A Louisiana district court is without authority to compel the presence of an FBI agent who lives and works out of state;
2. Agent DiFonso's testimony in this matter would violate 28 C.F.R. Secs. 16.26(b)(3) and 16.26(b)(5) by disclosing classified information, records and investigatory techniques;
3. Neither the office of the Attorney General nor the FBI "can condone the practice of disrupting [their] operations [so that an FBI agent can testify as a character witness.]"
After considering the matter, the court accepted the letter as an assertion of a blanket privilege on behalf of Agent DiFonso. The court chose not to require Agent DiFonso to appear, and proceeded with the trial. The defendant then moved for a recess and a stay of the proceedings in an attempt to remove the proceedings to Federal court for resolution. On February 22, the Federal court refused to remove the matter.
At the outset, we note that due diligence in securing the presence of the witness at trial was not shown in this case. See, e.g., State v. Burns, 504 So.2d 124 (La. App. 2 Cir.1987), writ denied 505 So.2d 1142 (La.1987); State v. Green, 448 So.2d 782 (La.App.2d Cir.1984); State v. Clark, 437 So.2d 879 (La.App.2d Cir.1983), writ denied 442 So.2d 460 (La.1983). Although it appears that the defendant thought that Agent DiFonso would appear voluntarily, it was his responsibility to properly and timely ensure that his witnesses would appear. The only subpoena to Agent DiFonso was issued halfway through the trial. The right to compulsory process is predicated on the exercise of due diligence by the defendant. State v. Clark, supra.
Although we find that the defendant did not act with due diligence in trying to secure the appearance of this witness and find that the trial court acted correctly with respect to the procedural aspects of the subpoena issue, which is actually dispositive of this assignment of error, nevertheless, we will also consider the substance of the matter and whether the court acted properly in accepting the letter from the United States Attorney's Office *611 as the exercise of a privilege and, accordingly, excusing Agent DiFonso from appearing.
The state violates the defendant's right to compulsory process when it arbitrarily denies a defendant the opportunity to put on the stand a witness whose testimony would be relevant and material to his defense. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). State v. Hogan, 404 So.2d 488 (La.1981). In United States ex rel. Touhy v. Ragen, 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951), the Supreme Court decided generally that the Department of Justice may issue regulations governing disclosure of its records. However, the court expressly refused to decide the limits to be placed on the discretion of the U.S. Attorney.
The Louisiana Supreme Court faced this issue in State v. Andrews, 259 La. 339, 250 So.2d 359 (1971). Andrews is quite similar to the instant case.
Andrews was charged with auto theft. He attempted to call 2 FBI agents as witnesses for the defense. The FBI agents appeared at the trial, invoked the federal privilege at issue in this case, and refused to testify on the order of the U.S. Attorney General. The trial court accepted their claim of privilege and refused to order them to testify. The Louisiana Supreme Court denied the defendant's contention that his right to compulsory process had been violated and decided that the trial court, although charged with the ultimate determination of the validity of the Federal privilege, did not abuse its discretion in refusing to order the agents to testify. The Andrews court also decided that the trial court did not abuse its discretion by refusing to stay the state proceedings in order for the defendant to remove the matter to a Federal forum.
In the instant case, the defendant contends that since Agent DiFonso was not present, the court was not able to fully consider the applicability of the privilege to the facts known by the agent. However, it appears that the trial court did carefully consider the privilege question and decided that the privilege was validly invoked. The judge did not simply accept the assertion at face value. The trial court considered the claim of privilege and all arguments presented by defense counsel. After considering all points, the court then ruled:
In order to resolve this situation, the Court is going to rule that the letter of [the] Assistant Attorney General (sic) ... will be taken as a blanket claim of privilege on behalf of Agent DiFonso, and that all areas sought to be elicited from Agent DiFonso are covered by the blanket claim of privilege.
We find that under Andrews, the trial court did not abuse its discretion in allowing the United States to assert this privilege.
In Andrews, although the agents were present, the agents recited essentially their names, occupation and the fact that they were instructed by the U.S. Attorney not to testify. The Louisiana Supreme Court found that the trial court did not abuse its discretion by accepting the privilege without further inquiry. In this case, no purpose would be served by forcing Agent DiFonso to come to Louisiana so that he could give this litany. This was recognized by the trial court:
[I] don't see that I can accomplish anything by delaying the case in order to try to obtain [the] Assistant Attorney General (sic) ... or Special Agent DiFonso, at any type hearing before me. I have serious doubts that I could get Special Agent DiFonso here. Secondly, I think that if I had him here, [the] Assistant U.S. Attorney... would instruct him not to testify. And I think pursuant to his employment, he would decline to do so, ... Special Agent DiFonso would decline to testify.
The only difference between Andrews and the instant case is that in Andrews, the FBI agents personally appeared and invoked the Federal privilege. Defendant urges that this difference is critical and the trial court erred by refusing to command the presence of Agent DiFonso to personally invoke the privilege. In light of Andrews, the trial court's conclusion was correct.
We further find that the trial court did not err in ruling that the federal privilege *612 would prevent DiFonso from testifying about any of his associations with the defendant. The trial court was correct in ruling that on the instant facts, DiFonso could not be forced to testify about his professional dealings with the defendant. According to the defendant, he exclusively operated as an undercover operative for the FBI. There is no showing in this case that would require the FBI to publicly disclose its secret methods of operation; the methods themselves are not under constitutional attack. See especially Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957) (reversing a conviction because of an over broad assertion of government privilege) and the quoted passage from United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953) in Andrews.
The trial court was also correct in finding that the agent's knowledge of the defendant's activities would be privileged. The defendant testified that his contact with DiFonso about his alleged operation in Louisiana was very limited. Defendant stated that he called the agent on April 22 to inform him that he was working on a drug case but did not call back to tell DiFonso what had transpired because he was not supposed to be working on drug cases. This limited contact was within the bounds of the defendant's working relationship with the FBI, which is privileged generally.
For all of these reasons, this assignment of error is without merit.

OTHER CRIMES EVIDENCE
The defendant contends that the trial court erred in refusing to grant his motion for a mistrial when Trooper Buckley, testifying in response to a defense question, mentioned that the defendant may have been involved in a similar crime in California.
As stated earlier, the defendant was a suspect in the unsolved murder of another man in California. In the California case, as in the present case, the defendant was the beneficiary of insurance policies on the life of the victim.
The first instance of which the defendant complains occurred during the cross-examination of Trooper Buckley about his trip with Deputy Flowers to California to meet with LAPD Sergeant Kalk. At the point where the objectionable reference occurred, defense counsel was asking Trooper Buckley why he decided to go to California. Trooper Buckley testified that an insurance company investigator, Mr. Schoenfeldt, had led him to contact Sgt. Kalk in Los Angeles in reference to the defendant and that this contact led he and Deputy Flowers to travel to California. Defense counsel then questioned Trooper Buckley as to whether he and Deputy Flowers took some bullets and cartridges with them to California. Defense counsel asked Trooper Buckley whether there was any reason germane to this case for taking the bullets to California. Buckley responded, "It was germane to take the bullets to California. Not necessarily for this case. But a possible homicide that occurred there."
Defense counsel then moved for a mistrial. The jury was removed and the motion was argued, but overruled. After rejecting the motion for a mistrial, the trial court offered to admonish the jury; defense counsel refused the admonishment. After the jury was returned to the courtroom, defense counsel asked the witness two more questions about the bullets. Buckley testified that the bullets were taken to California to determine whether they matched bullets from another homicide; he stated that the bullets did not match.
On appeal, defendant makes the bare assertion that Buckley's remark "was seriously prejudicial to the defendant." LSA-C.Cr.P. Art. 770(2) provides:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to: ... (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.
However, the testimony of a police officer is not covered by this provision. This argument is controlled by LSA-C.Cr.P. Art. 771(2) which provides in pertinent part:

*613 In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial... when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
. . . . .
(2) When the remark or comment is made by a witness or person other than the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
In State v. Williams, 26,655 (La.App. 2 Cir. 3/1/95), 651 So.2d 331, this court stated:
[A] statement, made by a state witness and not the district attorney, does not mandate a mistrial under La.C.Cr.P. art. 770(2); State v. Wingo, 457 So.2d 1159 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985); Ordering a mistrial is therefore discretionary. La.C.Cr.P. art. 771(2). Factors the court may consider in determining whether a mistrial is warranted are whether the statement was (1) deliberately elicited by the district attorney, (2) responsive to the question, and (3) uttered by the witness to prejudice the defendant. State v. Perry, 420 So.2d 139 (La.1982), cert. den., 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983); State v. Gene, 587 So.2d 18, 21 (La.App. 2d Cir.1991), writ denied, 604 So.2d 993 (La. 1992).
The ordering of a mistrial is a drastic remedy and, unless mandatory, is committed to the sound discretion of the trial judge. State v. Wingo, supra; State v. Burdgess, 434 So.2d 1062 (La.1983). A discretionary mistrial should be ordered only if a trial court determines that an admonition is not adequate to assure the defendant a fair trial. La.C.Cr.P. art. 771; State v. Tribbet, 415 So.2d 182 (La.1982). Williams, supra.
In this case, the witness' statement was elicited by defense counsel, not the prosecution. From this record it is clear that the statement was not made to prejudice the defendant, but was made in response to defense counsel's cross examination as to why the bullets were taken to California. Defense counsel's questioning sought to elicit from this witness that the bullets were not involved in the present case, but were taken for comparison to bullets recovered in another case.[4]
Further, whatever prejudice the defendant suffered was cured by the witness' later statements that the bullets or cartridges proved to be unrelated to any other investigation. The trial court correctly denied this motion for a mistrial. The defendant's arguments on this issue are without merit.

BATSON CHALLENGES
The defendant contends that he was denied equal protection of the law because the state illegally used its peremptory challenges to exclude African-Americans from the jury because of their race. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); LSA-C.Cr.P. Art. 795(C-E). The jury ultimately was composed of 11 white jurors and 1 African-American juror.
A successful Batson argument first requires the defendant to make a prima facie case of race-based exclusion, i.e., that the pertinent circumstances raise an inference that the prosecutor used peremptory challenges to exclude venire members of a cognizable racial group solely on the basis of race. State v. Collier, 553 So.2d 815 (La. 1989); State v. Tucker, 591 So.2d 1208 (La. App. 2d Cir.1991), writ denied, 594 So.2d 1317 (1992). The defendant need no longer show that he is a member of this excluded class. Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).
Once the defendant makes a prima facie showing, the burden shifts to the state to establish race-neutral reasons for its peremptory challenges. These reasons need *614 not rise to the level of a challenge for cause, but must be more than the prosecutor's belief that a prospective juror would be biased because of his race. State v. Tucker, supra. A neutral explanation must be clear, reasonably specific, legitimate and related to the case at bar. State v. Collier, supra.
The trial court's findings as to purposeful discrimination depend largely on credibility evaluations and are therefore entitled to great deference by the reviewing court. Batson, supra. In order to preserve the complaint that the prosecutor's use of a peremptory challenge was based on race, the defendant must make an objection before the entire jury panel is sworn. State v. Williams, 524 So.2d 746 (La.1988); State v. White, 535 So.2d 929 (La.App. 2d Cir.1988), writ denied, 537 So.2d 1161 (1989). State v. Mamon, 26,337 (La.App. 2 Cir. 12/16/94), 648 So.2d 1347.
In this case, the defendant made a timely objection to the state's initial use of peremptory challenges. The trial court implicitly found that the defendant had made a prima facie case of race-based exclusion. The state then proceeded to explain the peremptory challenges at issue. The court accepted the state's explanations as to each potential juror.
After the alternate jurors were sworn, the defendant renewed his Batson challenge. Again, the court required the state to provide racially neutral grounds for excusing the 2 African-American alternate jurors, and again these explanations were accepted.
We have reviewed the record and have evaluated the reasons offered by the prosecution as to each of the challenged jurors. We find that the trial court did not err in accepting the reasons offered by the prosecution.
Each of the state's peremptory challenges had a valid, race-neutral explanation. The overwhelming majority of challenges were based on the jurors' knowledge of the family of the victim and defendant, well-established race-independent grounds. State v. Mamon, 26,337 (La.App. 2d Cir. 12/16/94), 648 So.2d 1347. Other jurors were excused because they had prior misdemeanor convictions or had close relatives who had been convicted of crimes. Still others were excused for their lack of understanding of the law, or for inattention. Each of these is a valid, racially neutral reason for exercising a peremptory challenge. State v. Mamon, supra. This assignment of error is without merit.

CONCLUSION
For the reasons stated above, we affirm the conviction and sentence of the defendant, Charles H. Parker, Jr.
AFFIRMED.
NOTES
[1] Sheriff Parker was not related to the deceased or the defendant.
[2] The defendant has failed to brief or argue in brief assignments of error 1, 7, 8 and 9. These unbriefed and unargued assignments of error are considered abandoned. URCA 2-12.4; State v. Schwartz, 354 So.2d 1332 (La.1978).
[3] The prosecution and the defendant have agreed that the issue of the admissibility of the defendant's credit card records is governed by California law. However, we find that the production of the credit card records under these facts does not violate the Louisiana constitution.
[4] The record also shows that the defense counsel was admonished by the court against trying to cause a mistrial by the questioning of another defense witness.