MOORE, J.
1 ]The defendant, Marcellus Adams, was indicted by a grand jury on the charge of second degree murder for the death of Michael Blackshire. Following trial, a unanimous jury found the defendant guilty as charged. The court sentenced the defendant to life imprisonment without benefit of probation, parole, or suspension of sentence. He now appeals both his conviction and sentence. For the following reasons, we affirm.
FACTS
Near dusk on the evening of July 7, 2012, the defendant struck Michael Black-shire numerous times with a blunt instrument, likely a long, two-by-four board or possibly a pipe, just as Blackshire was calling 911 for help. Witnesses to the incident said the defendant then left the scene while Blackshire lay on the ground unconscious, his skull caved in, teeth knocked out, gasping for breath and bleeding profusely. Blackshire was taken to the LSU medical center in Shreveport where he died less than 24 hours later.
The defendant was arrested the following day. He admitted to striking Black-shire in the head with a two-by-four and knocking him out. He first claimed that Blackshire attacked him with a knife and he was defending himself; he later changed the story, stating that he was protecting his wife from the victim. The two-by-four was never located or identified. The record shows that the incident occurred in an open lot behind the house located at 4130 Miles Street in Shreveport. The residence and lot are owned by Leroy Scott, age 69. Scott testified at trial that he lives in the house with his younger brother, but he allows people to use the back lot to congregate daily to play dominoes, talk, barbeque, drink and sleep. There is also a “junk house” on the back lot where, among other things, Scott and his 1 gbrother perform repairs on lawn mowers and bicycles, but the house also has a bed in which people frequently spend the night.
Scott said that the defendant and Michael Blackshire often visited this area, and, according to Scott, the two men frequently bickered regarding the same woman who Scott knew only by the moniker, “Buck Teeth,” but was identified as a woman named Sherniecy Smith. He implied that this was the source of the con *1108 tinuing animosity between the defendant and Blackshire. Scott testified that on the evening of the incident, the defendant arrived very agitated because he could not find his “friend girl,” i.e., Sherniecy Smith.
Other than the defendant and Michael Blackshire, the other people present that evening were Sarah Davis, Robert Rattler and Donald Ashley. Scott said that the defendant and Blackshire began talking loudly and trading insults. Blackshire wanted to call 911 to report threats the defendant was making against him. However, Scott intervened and steered Black-shire away from the defendant, advising him to remain on the porch of his house and to let things cool down rather than call 911. After giving this advice, Scott went into his house. He did not witness the incident that followed.
Blackshire called 911 at 9:03 p.m.[1] This recording indicates that he identified himself as Michael Blackshire, gave his address, and reported that someone was threatening him. A male voice can be heard in the background speaking loudly. Blackshire asked someone, “Why he is running?” Blackshire told the dispatcher from where he was calling. He said that Marecellus was threatening and bothering him, and Marecellus was wearing lsa white shirt and blue pants. He stated that he was coming back towards him. The dispatcher asked Blackshire if Marecellus had any weapons; Blackshire stated that Ma-recellus has just picked up a two-by-four. Then, Blackshire said, “No!” and repeated several times that “He is getting ready to hit me!” The sounds of scuffling and cursing followed. A female voice yelled out, “Leave him alone!” The recording ended.
The female voice heard at the end of the recording was likely that of Sarah Davis, the only woman present. Davis said that she had drunk a half pint of whiskey that day, but normally drinks more. She said that her back was turned from the defendant and Blackshire while she got a drink of water. When she turned, she saw the defendant striking Blackshire “two more times” very hard with a long object as he lay motionless on the ground. As she remembered it, the defendant struck Blackshire “a couple of times more” while Blackshire was motionless on the ground. She could not recall exactly what she said, but said she was hollering at the defendant loudly.
Robert Rattler testified that he saw the defendant and Blackshire talking some 20 to 40 paces from him. He said he had drunk only two beers and was not intoxicated. Rattler testified that he saw Blackshire walk away from the defendant toward him (Rattler) while making a telephone call on his cell phone. He said he overheard the dispatcher say 911 on Blackshire’s cell phone, but Blackshire did not say anything. He then saw the defendant approach, pick up a “long big old white thing,” possibly a stick or a pipe, and strike Blackshire in the back of his head. Rattler saw Blackshire fall to the ground, and the defendant struck Black-shire one more time in the chest. Rattler described Blackshire as choking for air and bleeding from the back of l4his head. The defendant left the scene immediately with nothing in his hands.
Meanwhile, Leroy Scott, who was inside his home watching television, heard a scream and ran outside to find Blackshire lying on the ground.
Minutes later, the Shreveport Police Department and Fire Department arrived around 9:16 p.m. to find Blackshire lying on the ground, choking on his blood and *1109 several teeth scattered on the ground. Officer Brent Bordelon described Black-shire’s face as being sunken in. He testified that nearby persons were detained, and that he did not recall any of the witnesses being intoxicated. There were no weapons located near Blackshire or in his hands.[2] Blackshire was transported to LSU Shreveport Hospital, where he died the following day at 1:04 p.m.
Dr. James Traylor, a forensic pathologist at the LSUS Health Sciences Center, performed Blaekshire’s autopsy. He testified that the death certificate listed the cause of death as hemorrhagic shock and blunt force injuries from being “struck with a wooden object by another.” Dr. Traylor stated that the death certificate was consistent with his autopsy results.[3] He said Blackshire suffered numerous blunt force injuries that included five blows to his head, seven blows to his upper arms, two blows to his chest, one blow to his abdomen, three blows to his left thigh, and 12 of his teeth knocked out.
IsDr. Traylor also testified that the patterns of abrasions on Blackshire’s body were caused by a long and linear object with a squared-off end (two right angles). The injuries could have been caused by a blunt object, such as a lead pipe or a two-by-four. He stated that Blackshire had no injuries to his own hands, knuckles, back, the back of his head, his shoulders, or the back of his legs.
The defendant was apprehended the next day. Shreveport Police Corporal Brian Lauzon testified that he asked the defendant what happened after he read him his Miranda rights and the defendant said he understood his rights:[4]
And I asked him what happened. He said he basically got the best of the guy. In one of his first statements he said that the guy came towards him with a knife, so he picked up a board and struck with it.
And I asked him, where did you hit him with it?
And he said, in the head.
And I asked him if he knocked him out.
And he said he thinks he did.
I asked him what happened next, did you call the police? He says, no, he left after that.
[[Image here]]
Then after that, kind of changed things to say that he went toward — the victim went towards his wife, and he thought he was going to do something to his wife, so that’s when he picked up the board and struck the guy, the victim, had a knife and was going towards his wife, and that’s when he picked up the board and struck the victim.
Corporal Lauzon testified that the defendant ultimately presented three versions of the event.
| fiShreveport Police Detective Shonda Holmes interviewed the defendant. The state introduced a recording of this interview into evidence, without objection, as Exhibit # 58 and published it for the jury. Summarizing this interview, the defendant stated that Blackshire was arguing with his wife; that the defendant tried to defend his wife; that Blackshire came towards him with a knife or a box cutter; and that he (the defendant) grabbed a two- *1110 by-four and struck Blackshire once on his head and once on the side of his face.[5] He said that Blackshire was not on his cell phone when he struck him.
Katie Traweek, a DNA analyst with the North Louisiana Criminalistics Lab, testified that she tested the defendant’s clothes and found only the presence of his own blood on his pants.
The defense did not present any witnesses.
The jury unanimously found the defendant guilty as charged. On September 4, 2013, after his motion for post-verdict modification was denied, the defendant waived sentencing delays and received the mandatory sentence of life imprisonment, without the benefit of probation, parole, or 17suspension of sentence. On September 6, 2013, the defendant filed a notice of appeal.
DISCUSSION
By his first assignment of error, the defendant argues that the evidence adduced at trial was insufficient to prove that he committed second degree murder. Specifically, he points to inconsistencies in the accounts given at trial by the three witnesses at the scene of the incident, namely Leroy Scott, Sarah Davis, and Robert Rattler. Their testimony was not reliable, he argues, due to their likely intoxication, and particularly the account by eyewitness Rattler that the defendant struck the victim only twice, which was contradicted by the testimony from the forensic pathologist, Dr. Traylor, who stated that the victim was struck 18 times corresponding to that number of wounds on the victim. These inconsistencies make their testimony suspect and thus rendered the evidence insufficient to convict the defendant on the charge of second degree murder.
The standard of appellate review for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App. 2 Cir. 1/14/09), 1 So.3d 833, writ denied, 2009-0310 (La.11/6/09), 21 So.3d 297. It is the function of the trier of fact to assess credibility and resolve conflicting testimony. State v. *1111 Thomas, 609 So.2d 1078 (La.App. 2 Cir.1992), writ denied, 617 So.2d 905 (La.1993); State v. Bonnett, 524 So.2d 932 (La.App.2 Cir.), writ denied, 532 So.2d 148 (La.1988). The trier of fact hears the testimony first hand and unless the fact finder’s assessment of believability is without any rational basis it should not be disturbed by a reviewing court. State v. Mussall, 523 So.2d 1305 (La.1988); State v. Combs, 600 So.2d 751 (La.App. 2 Cir.), writ denied, 604 So.2d 973 (La.1992).
Second degree murder includes the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1. Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. State v. Cortez, 48,319 (La.App. 2 Cir. 8/7/13), 122 So.3d 588, 593. Specific intent is an ultimate legal conclusion to be resolved by the fact finders. State v. Lecompte, 371 So.2d 239, 243 (La.1979).
To obtain a second-degree murder conviction, the state was required to show beyond a reasonable doubt that Blackshire was killed by the defendant, and that the defendant had the specific intent to kill Blackshire or Rinflict great bodily harm upon him.
The testimony at trial and physical evidence does not show that the defendant was in danger from the victim, nor protecting Sherniecy Smith. Officer Holmes testified that, according to witnesses to the beating, Sherniecy was not present and did not arrive until later, after the incident was over. Leroy Scott, Sarah Smith, and Robert Rattler all testified that Sarah was the only female present. Although a pocketknife was found in the victim’s pocket at the hospital, none of the witnesses saw the victim brandishing a knife, nor was there a knife in either hand or near his body when police arrived. The evidence strongly indicates that Blackshire, who was 5'7" tall feared the much taller, 6'2" defendant, and he was calling 911 on his cell phone when he was brutally attacked by the defendant.
Dr. Traylor testified that the wounds indicated that Blackshire was struck 18 times with a blunt instrument. While Sarah Davis actually saw the defendant strike the victim “two more times” as he lay motionless on the ground, the circumstances obviously indicated to her that he had been struck violently prior to those blows.
The greatest inconsistencies concern the testimony of Robert Rattler, who said he saw the defendant pick up a long object and strike the victim once in the back of the head while the victim was calling 911. He testified that Blackshire never said anything to the 911 dispatcher who he heard say, “911.” The victim fell to the ground. The defendant struck him only once more and then left. Blackshire lay on the ground bleeding and choking for air.
Rattler’s testimony is inconsistent with the physical evidence of 18 |]()blows to the victim, none of which were to the back of the head, and the lengthy 911 recording of Blackshire’s statements to the dispatcher and the attack itself heard on the recording. On the other hand, Rattler’s vivid testimony regarding Blackshire laying on the ground struggling to breathe appears to be consistent with his injuries. Most importantly, Rattler’s testimony identifies the defendant as the aggressor who struck the victim with a “long big old white thing.”
Leroy Scott testified that he did not witness the beating, and only saw Black-shire lying on the ground. However, he *1112 testified regarding who was present at the time and the argument between the defendant and Blackshire. Dr. James Traylor testified that Blackshire had a total of 18 blunt force injuries on his head, upper arms, chest, abdomen, and left thigh (with 12 of his teeth being knocked out), caused by a long and linear blunt object, with a squared-off end (two right angles), such as a lead pipe or a two-by-four. Dr. Traylor also stated that Blackshire had no injuries to his own hands, knuckles, back, shoulders, or the back of his head or legs. Sarah Davis testified that she saw the defendant hit the victim hard “two more times” with a long instrument as he lay unconscious on the ground.
As the trier of fact, the jury had the discretion to accept or reject all or part of any testimony, to decide how much weight to give to a witness’s testimony, and to determine what is credible and what is not credible while performing its duty and reaching its conclusions. In this case, they obviously concluded that the defendant was the aggressor with specific intent to kill or cause great bodily harm to the victim.
Based on our review, we conclude that a rational trier of fact could [ n certainly have found from this evidence that the defendant had the specific intent to kill or commit great bodily harm and that the state has proven these essential elements of the crime of second degree murder beyond a reasonable doubt.
Therefore, this assignment of error is without merit.
By his second assignment of error, the defendant argues that, under the facts and circumstances of this case, the trial court erred when it did not grant a downward departure from the mandatory life sentence. The defendant complains that the trial court did not discuss any mitigating factors, thus making it impossible to know whether circumstances existed which would have warranted a downward departure from the mandatory sentence.
In opposition, the state emphasizes that the defendant did not file a motion to reconsider sentence, and that the circumstances of the case do not warrant a downward departure from the mandatory life sentence. Specifically, the state asserts that the defendant mercilessly bludgeoned Blackshire to death by striking him 18 times with a two-by-four, and continued to attack Blackshire as he lay motionless and unconscious on the ground. The state points to the evidence that the defendant broke numerous bones in the victim’s face, knocked out 12 of his teeth, tore his liver, and left him unrecognizable for his family. The state also emphasizes that the defendant did not turn himself in to the authorities and has not shown any remorse for his actions.
Whoever commits the crime of second degree murder shall be | ^punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1. Where there is a constitutional mandatory sentence, there is no need for the trial court to justify, under Art. 894.1, a sentence it is legally required to impose. State v. Koon, 31,177 (La.App. 2 Cir. 2/24/99), 730 So.2d 503; State v. Rose, 606 So.2d 845 (La.App. 2 Cir.1992); State v. Gill, 40,915 (La.App. 2 Cir. 5/17/06), 931 So.2d 409, 413 writ denied, 2006-1746 (La.1/26/07), 948 So.2d 165.
Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review. La. C. Cr. P. art. 881.1.
*1113 To rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that because of unusual circumstances this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. State v. Lindsey, 99-3302 (La.10/17/00), 770 So.2d 339.
Because the defendant did not file a motion to reconsider sentence, this court’s review is limited to the bare claim that his sentence is constitutionally excessive. La. C. Cr. P. art. 881.1. There was no need for the trial court to justify, under La. C. Cr. P. art. 894.1, a sentence that it is legally required to impose. In addition, to rebut the presumption that the mandatory sentence is constitutional, the defendant must clearly and 1 ^convincingly show that, because of unusual circumstances, he is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. Here, the defendant has not sufficiently demonstrated that he is the “exceptional” defendant for which downward departure from the statutory minimum sentence is required.
This assignment of error is without merit.
CONCLUSION
For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED.

. The state introduced a recording of this phone call into evidence, without objection. The call lasted for one minute and 40 seconds.

.Shreveport Police Corporal Sherry Stump testified that Blackshire had the following belongings: a plastic bag carrying a pocketknife, a set of keys on a key chain, a black wallet, a package of Rain cigarettes, and $2.50.

. The state introduced a copy of the coroner’s report/autopsy findings into evidence, without objection, as Exhibit # 9.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The following is a comprehensive summary of the defendant's interview: The defendant said that Blackshire was arguing with him and his "wife," Sherniecy Smith; that he and Blackshire had a history of arguing; that Blackshire pushed him and he pushed back; that he attempted to walk away and then heard someone yell "Watch your back!”; that he turned around and saw Blackshire coming towards him with an open knife or box cutter; that he grabbed a wooden two-by-four board from Mr. Leroy’s woodpile (near a fence) to defend himself against Blackshire; that he turned around and swung the board at Black-shire and struck him twice, once while Black-shire was standing and once when he fell to the ground; that he struck Blackshire in the face and on the side of the head; that all this occurred near a tree and a fence; that he left the scene and did not call the police because he was not thinking; that the victim did not call 911; that he was defending himself and his "wife,” and he left the scene before she did; that he had smoked more than six blunts and had two 40-ounce Olde English malt liquors that day; that he was wearing a white shirt and blue jeans; that he did know his "wife's” address or her whereabouts; that he did not remember what he did with the board; and that he was angry, pissed, scared and did not know what the hell had happened.