STEWART, J.
| iThe defendant, Robert Earl Walter, was convicted by a unanimous jury of second degree murder and sentenced to life imprisonment, without benefit of probation, parole, or suspension of sentence. He now appeals, arguing that the evidence was insufficient to convict him of second degree murder. For the reasons set forth in this opinion, we affirm.
FACTS AND PROCEDURAL HISTORY
On October 10, 2012, the defendant shot and killed April Fulghum (“victim”) at the Lexington Place Apartments (“the Lexing *1137 ton”) in Bossier City, Louisiana. The defendant turned himself in to the authorities, and confessed to shooting the victim. On December 10, 2012, the defendant was charged via bill of indictment with second degree murder in violation of La. R.S. 14:30.1. Soon thereafter, the defendant requested that a sanity commission be appointed. After reviewing the doctor’s reports and recommendations, the trial court found that the defendant possessed a factual understanding of the proceedings. Further, the defendant was not suffering from a mental disease or defect that would prevent him from either participating in his defense or understanding right from wrong.
On June 18, 2013, a free and voluntary hearing was conducted to determine the admissibility of the defendant’s statement made to the police after he turned himself in. Detective Michael Hardesty of the Bossier City Police Department, Violent Crimes Unit, testified that he advised the defendant of his rights and had him sign a card to that effect prior to taking the defendant’s recorded statement. After listening to the recorded |2interview, the trial court determined that the defendant’s statement was freely and voluntarily given, and would therefore be admissible at trial.
The jury trial commenced on June 26, 2013. The following evidence was adduced at trial.
Detective Hardesty testified that on October 10, 2012, he responded to the 11:30 a.m. call that reported a shooting at.the Lexington. As mentioned above, Hardesty took the defendant’s statements a few hours after the shooting. Hardesty testified that the defendant appeared angry from the onset, and became angrier as the interview progressed.
During the interview, which was played for the jury, the defendant stated that he went home to retrieve his uniform, and that he also retrieved his gun, a .38 revolver, from his house. He then went back to the Lexington, walked into the victim’s office, and fired the gun at her until it was empty. He also .stated that had Kim Pel-, legrin been present, he would have shot her also. The defendant stated that he placed the gun under a wicker chair on the carport of his home, so that he wouldn’t be armed when he turned himself in.
Fairfield Property Management (“Fair-field”) manages the Lexington. Kimberly Pellegrin, director of human resources for Fairfield, testified that she is responsible-for employee hiring, discipline, termination, and the resolution of employee complaints. She stated that the victim had been the property manager at the Lexington for two years, and that her duties included supervising the staff. Pellegrin testified that she hired the defendant as a painter in July 2013 through a temporary agency. She noted |sthat the defendant, had previously worked at another Fairfield company, Fairfield Construction. Based on the defendant’s positive reviews from his work at Fairfield Construction, Pelleg-rin made the decision to offer him a permanent position at the Lexington. She gave him a written description of his job duties, which she reviewed with him before having him sign and date it. In addition to his job duties as a painter, the defendant was required to perform additional duties such as assisting in the maintenance and upkeep of the property and equipment, and assisting other employees.
Pellegrin recalled the defendant demanding, approximately one month before the shooting, that he receive a raise because he was being asked to repair drywall, a job that he asserted was not included in his job description. 'She-informed him that this repair was included in his job description. The defendant complained that two of his female coworkers, Sabrina *1138 Walker and Jimmie Richardson, were not doing their assigned work. He believed that he and James Lovelace, the maintenance man, were being forced to take on Walker and Richardson’s work, in addition to their own.
On October 9, 2012, Pellegrin received emails from the victim and the victim’s supervisor, Patsy Lester. The victim wrote that on October 5, 2012, she instructed the defendant to perform trim work in an apartment that a tenant was moving into that day. The defendant refused, saying “it was Sabrina’s job, not his,” again complaining that Sabrina did not do her job. Lester wrote that the defendant contacted her on October 5, 2012, after his disagreement with the victim, and yelled at Lester about Sabrina and |4Jimmie. Lester informed the defendant that she would speak with the victim about Sabrina. On October 9, 2012, Pellegrin met with the defendant, victim, and Lester at Fairfield’s office in downtown Shreveport. The victim complained that the defendant had yelled and even cursed at her in front of other employees and prospective tenants. The defendant was adamant that the tasks the victim assigned to him were not within his job duties. Pellegrin testified that the defendant was agitated, and focused on his complaints lodged against Sabrina instead of the complaints lodged against him. Pel-legrin felt that the defendant’s actions constituted a final warning. After the meeting ended at approximately 3:30 p.m., she instructed the defendant to return to work.
On the morning of October 10, 2012, the victim notified Pellegrin that the defendant not return to work the previous afternoon as instructed. Pellegrin made the decision to terminate the defendant’s employment, and arranged for a meeting to take place at 9:00 a.m. Pellegrin, the defendant, and the victim met at the victim’s office at the Lexington at the designated time. The defendant was notified of his termination, and Pellegrin and the victim explained that he was being terminated for failing to return to work after being issued the final warning. Walter stated that he was unaware of his instruction to return to work the previous day. Pellegrin testified that after the meeting ended at approximately 9:15 a.m., the defendant left the premises to retrieve his tools and uniforms from his home. She stated that the defendant did not appear to be upset, but did not say much.
lfiBoth Lesley Wálker, the assistant manager at the Lexington, and William Brandon Butler, the floating assistant manager, testified that on October 10, 2012, they were in the office at the Lexington when the defendant was fired. Walker and Butler were also in the office with the victim when the defendant returned several hours later with his uniforms draped across his arm.
Walker was standing in the doorway of the victim’s office, facing the victim and Butler, with her back to the door. Butler was sitting in a chair at the victim’s desk, the victim was standing next to him, and they were both facing Walker and the door.
Walker heard the defendant tell her to “step back” and then say, “hey April.” The defendant fired the gun at the victim, who had crouched down in a corner, facing the wall. After the defendant fired the first few shots, Walker left the office to call 911 and to locate the courtesy officer, Brent Tyson. She was met by James Lovelace in the hall, and they fearfully left the building. By the time Walker and Tyson returned, the fire department had arrived.
Butler testified that when the defendant entered the victim’s office holding in his right hand at waist level what he thought to be a .38 snub nose revolver, he backed *1139 himself into a córner of the victim’s office. Butler saw the victim holding up her hand as two bullets hit her, and then saw her fall face forward before two more bullets entered her back. He testified that the defendant fired the gun until it was empty, about four to six shots. The defendant then turned and ran out the door. Butler shook the victim, but she 16was unresponsive. He called 911, and continued to monitor the victim. When the fire department arrived, an officer escorted him outside.
Lovelace testified that he was present when the defendant walked in and shot the victim. The defendant had previously told him that he wanted to transfer to another apartment. Lovelace did see the defendant immediately after he was terminated, and the defendant informed him that he had been fired.
Robert Flournoy, a firefighter and paramedic with the Bossier City Fire Department, responded to the 911 call after the shooting, arriving at 11:49 a.m. Upon arrival, Flournoy noticed that the victim suffered from multiple gunshot wounds, that the members of the fire department were administering CPR, but that she was unresponsive with no pulse, and was not breathing. He accompanied the victim as she was being transported to the hospital, and testified that physicians unsuccessfully attempted to revive her.
During the defendant’s testimony, he apologized to the victim’s family, stating that he never meant for the shooting to happen. He expressed his unhappiness at the Lexington because Sabrina would “lay around” and not do her work. She would give her work orders to him and Lovelace to perform. He testified that he reported his complaints to the victim and Pellegrin, but nothing was done to rectify the situation.
Discussing the October 5, 2012, incident, the defendant admitted to cursing and yelling at the victim, but noted that she was doing the same to him. The victim then instructed him to give her his keys, and sent him |7home. He denied hearing anyone instructing him at the close of the October 9, 2012, meeting to return to work. Further, he was confused about returning to work for only 15 minutes of work.
After he was fired, the defendant testified that he was devastated. He said that Sabrina followed out of the office taunting him. The defendant testified that he shot the victim because she refused to do anything about the “Sabrina problem,” and because he was being disrespected and mistreated.
Dr. James Traylor, a forensic pathologist, was offered and accepted as an expert in the forensic pathology. Traylor testified that he performed the autopsy on the victim, and found eight wounds caused by the defendant’s shots. Two shots, one to the victim’s upper right arm and one to her upper right back, damaged the soft tissue and caused hemorrhaging. One shot to the victim’s back hit her ninth rib, perforated her left lung, and struck her eighth rib. Traylor testified that the shot that entered the victim’s right clavicle caused the most fatal wound, shattering the victim’s third rib. The resulting bone fragments cut three major blood vessels, her pulmonary artery, her aorta, and her superior vena cava, as well as her right lung. Ultimately, Traylor confirmed that the victim’s cause of death was multiple gunshot wounds.
At the crime scene, officers recovered four projectiles: one from the east wall of the victim’s office, one from the floor of the victim’s office, one from the windowsill, and one from the weight room on the other side of the north wall of the victim’s office. *1140 The fifth projectile was recovered from the victim’s body during the autopsy.
| ¡¿During a search of the defendant’s home, officers were able to recover a .38 Smith & Wesson revolver with five-chamber cylinder, holding five empty casings. Counsel for the defendant stipulated that the bullets recovered from the crime scene and the victim’s body all came from the gun found at the defendant’s home. A search of the defendant’s truck yielded a written warning that he received on the afternoon of October 9, 2012, a written notice of his termination on October 10, 2012, and a folder with information regarding his termination from a previous employer.
On June 27, 2013, the jury unanimously found the defendant guilty as charged of second degree murder. On July 9, 2013, the trial court sentenced the defendant to life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. The defendant filed the instant appeal.
LAW AND DISCUSSION
In the defendant’s sole assignment of error, he alleges that there was insufficient evidence to prove that he was guilty beyond a reasonable doubt of second degree murder. More specifically, the defendant argues that based on the facts of this case, the jury should have found'him guilty of manslaughter, and not second degree murder.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); \ .State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert, denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833. On appeal, a reviewing court must view the evidence in the light most favorable to the state and must presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. Jackson, supra.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 2009-0725 (La.12/11/09), 23 So.3d 913, cert, denied, 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010); State v. Hill, 42,025 (La. App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. Direct eyidence provides proof of the existence of a fact, for example, a witness’s testimony that he saw or heard something. State v. Lilly, 468 So.2d 1154 (La.1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. Id. |! pWhen the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the cir *1141 cumstances established by the evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, unit denied, 2009-0372 (La.11/6/09), 21 So.3d 299. This is not a separate test that applies instead of a sufficiency of the evidence test when circumstantial evidence forms the basis of the conviction. Id. Rather, all of the evidence, both direct and circumstantial, must be sufficient under Jackson to convince a rational juror that the defendant is guilty beyond a reasonable doubt. Id.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, supra; State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255, cert, denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753; State v. Burd, 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La.11/9/06), 941 So.2d 35.
The fact finder is charged with making a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any | nwitness; thus, the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Eason, supra; State v. Casey, 99-0023 (La.01/26/00), 775 So.2d 1022, cert, denied, 531 U.S. 840,121 S.Ct. 104,148 L.Ed.2d 62 (2000). Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. State v. Robinson, 36,147 (La. App.2d Cir.12/11/02), 833 So.2d 1207; State v. Ponsell, 33,543 (La.App.2d Cir.8/23/00), 766 So.2d 678, unit denied, 2000-2726 (La.10/12/01), 799 So.2d 490.
La. R.S. 14:30.1 provides:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juvenile, or terrorism, even though he has no intent to kill or to inflict great bodily harm.
Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); State v. Glover, 47,311 (La.App.2d Cir.10/10/12), 106 So.3d 129, unit denied, 2012-2667 (La.5/24/14), 116 So.3d 659; State v. Davies, 35,783 (La.App.2d Cir.4/05/02), 813 So.2d 1262, unit 'denied, 2002-1564 (La.5/9/03) 843 So.2d 389. Specific intent |12may be inferred from the circumstances surrounding the offense and the conduct of the defendant. Glover, supra, The determination of whether the *1142 requisite intent is present in a criminal case is for the trier of fact, and review of that determination is to be guided by the standard of Jackson v. Virginia, swpra. Glover, supra.
The Louisiana Supreme has held on more than one occasion that specific intent to kill may be inferred from a defendant’s act of pointing a gun and firing at a person. State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, cert, denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Williams, 383 So.2d 369 (La.1980). Further, the discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Dooley, 38,763 (La. App.2d Cir.9/22/04), 882 So.2d 731, writ denied, 2004-2645 (La.2/18/05), 896 So.2d 30; State v. Brooks, 36,855 (La.App.2d Cir.3/05/03), 839 So.2d 1075, unit denied, 2003-0974 (La.11/07/03), 857 So.2d 517.
La. R.S. 14:31, which defines manslaughter, states in pertinent part:
A. ' Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
11a“Sudden passion” and “heat of blood” are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. State v. Lombard, 486 So.2d 106 (La.1986); State v. Logan, 45,-136 (La.App.2d Cir.4/14/10), 34 So.3d 528, unit denied, 2010-1099 (La.11/5/10), 50 So.2d 812. In reviewing a defendant’s claim that he met this burden, the appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that these mitigating factors had not been established by a preponderance of the evidence. State v. Robinson, 32,794 (La.App.2d Cir.3/1/00), 754 So.2d 311, writ denied, 00-0989 (La.3/23/01), 787 So.2d 1008. Provocation and the time for cooling are questions for the trier of fact to determine according to the standard of the average or ordinary person. State v. Leger, 05-0011 (La.7/10/06), 936 So.2d 108, cert, denied, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007); State v. Deal, 00-0434 (La.11/28/01), 802 So.2d 1254, cert, denied, 537 U.S. 828,123 S.Ct. 124,154 L.Ed.2d 42 (2002); State v. Horn, 45,706 (La.App.2d Cir.11/3/10), 55 So.3d 100, writ denied, 2010-2721 (La.5/6/11), 62 So.3d 124. The appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that these mitigating factors had not been established by a preponderance of the evidence. Robinson, supra.
In the case sub judice, the defendant did not dispute that he shot the victim. Therefore, we must determine whether the state proved that the | 14 defendant had the requisite specific intent to kill the victim. The defendant’s expression of remorse after he had shot the victim does not mean that he did have *1143 the requisite specific intent to kill her. Further, the defendant’s alleged reasoning for shooting her, i.e. being frustrated with his job, feeling disrespected and mistreated, does not negate the presence of specific intent. We find that the specific intent to kill was demonstrated by the defendant’s act of deliberately pointing his .38 caliber pistol at the victim and firing it five times, until it was empty. As a result, the victim suffered for injuries so extensive that she did not survive.
The testimony and evidence presented at trial, when viewed pursuant to the Jackson standard in the light most favorable to the prosecution, was sufficient to support the conviction of second degree murder. As the trier of fact, the jury had the discretion to accept or reject all or part of any testimony, to decide how much weight to give to a witness’s testimony, and to determine what is credible and what is not credible while performing its duty and reaching its conclusions. State v. Adams, 49,053 (La.App.2d Cir.5/14/14), 139 So.3d 1106, 2014 WL 1911937. This evidence was sufficient for the jury to infer, as they did, beyond a reasonable doubt that the defendant possessed the specific intent to kill the victim. Further, the state has proven the essential elements of the crime of second degree murder beyond a reasonable doubt. A thorough review of the evidence does not support the defendant’s position that he met his burden of establishing that he acted in heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. The defendant’s overt acts of going |1fihome to retrieve his gun, driving back to work a couple of hours after being fired, and walking into the victim’s office to shoot her until his pistol was empty, when viewed in a light most favorable to the prosecution, manifest an intent to kill. Therefore, this assignment of error is without merit.
CONCLUSION
For the foregoing reasons, the conviction and sentence of the defendant, Robert Earl Walter, are affirmed.
AFFIRMED.